T.C. Memo. 2018-171

UNITED STATES TAX COURT

RICHARD I. PRESLEY AND MARTINE N. PRESLEY, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19520-16.                    Filed October 15, 2018.

David J. Looby, for petitioners.

G. Chad Barton, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge: Respondent determined a deficiency in, and an accuracy-related penalty under section 6662(a)[1] on, petitioners' Federal income tax (tax) for each of the years indicated, as follows:

---

[1]All section references are to the Internal Revenue Code (Code) in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[*2]

| Year | Deficiency | Accuracy-Related Penalty Under Sec. 6662(a) |
|------|-----------|--------------------------------------------|
| 2010 | $39,269 | $7,853.80 |
| 2012 | 54,445 | 10,889.00 |

The issues remaining for decision are:

(1) Are petitioners entitled for their taxable year 2010 to deduct $107,364 under section 170(a) for a claimed charitable contribution relating to certain land improvement expenses paid before 2010?  We hold that they are not.

(2) Are petitioners entitled for their taxable year 2010 to deduct $3,000 under section 170(a) for a claimed charitable contribution of a certain tractor/ mower?  We hold that they are not.

(3) Are petitioners entitled for their taxable year 2012 to deduct $235,422 under section 170(a) for a claimed charitable contribution of their residence?  We hold that they are not.

(4) Are petitioners liable for each of their taxable years 2010 and 2012 for the accuracy-related penalty under section 6662(a)?  We hold that they are.

[*3]                           FINDINGS OF FACT[2]

Some of the facts have been stipulated and are so found.

Petitioners, Richard I. Presley (Mr. Presley) and Martine N. Presley (Ms. Presley),[3] resided in Oklahoma at the time they filed the petition.

Businesses and Ministry of Mr. Presley

Mr. Presley has been an optometrist since around the early 1990s. He owned and operated several vision-care businesses (Mr. Presley's optometry businesses), each of which qualified as an S corporation.

On October 30, 1997, the Presleys, Rob Moritz (Mr. Moritz), who was Mr. Presley's brother-in-law, and Bertha Coffin (Ms. Coffin), who was a friend of the Presleys, incorporated Presley Family Ministries, Inc. (PFM), as a nonprofit corporation under the laws of the State of Oklahoma. Pursuant to its articles of incorporation, PFM had various powers and authority, including the power and authority "[t]o earnestly seek and promote the unity of God's people and churches in a Scriptural manner of Godly love, respect and faithful voluntary cooperation

---

[2]Unless otherwise indicated, our findings of fact pertain to petitioners' taxable years 2010 and 2012, the years at issue. For clarity, we sometimes expressly refer in our findings to the years 2010 and 2012.

[3]We shall sometimes refer to Mr. Presley and Ms. Presley as the Presleys.

[*4] with liberty." At all relevant times, including during 2010 and 2012, Mr. Presley was the pastor and primary spiritual leader of PFM.

Pursuant to its articles of incorporation, the registered agent of PFM was Mr. Presley, and the "post office address * * * and principal office" of PFM was the address of petitioners' single-family home and residential property (petitioners' residence) in Tulsa, Oklahoma (Tulsa), which they had purchased in May 1992 for $104,500.

Pursuant to its articles of incorporation, PFM was to have a board of trustees (PFM's board), the initial members of which were Mr. Presley, Ms. Presley, Mr. Moritz, and Ms. Coffin. Pursuant to those articles, the members of PFM's board were to be elected annually at a so-called annual business meeting of that board.

In a letter dated March 4, 1999 (March 4, 1999 letter), the Internal Revenue Service (IRS) determined that PFM (1) was an organization exempt from tax under section 501(a) because it was an organization described in section 501(c)(3) and (2) was not a private foundation within the meaning of section 509(a) because it was an organization described in sections 509(a)(1) and 170(b)(1)(A)(vi).

**[*5]** On June 25, 2004, an organization known as Universal Life Church[4] issued a so-called certificate of ordination to Mr. Presley. On July 9, 2004, an organization known as World Christianship Ministries[5] issued a certificate to Mr. Presley, which stated that it was conferring on him a "Barter of Divinity".

In a letter dated September 17, 2004 (September 17, 2004 letter), the IRS modified the determination in its March 4, 1999 letter that PFM was not a private foundation within the meaning of section 509(a) because it was an organization described in sections 509(a)(1) and 170(b)(1)(A)(vi). In its September 17, 2004 letter, the IRS determined that PFM is not a private foundation within the meaning of section 509(a) because it is an organization described in sections 509(a)(1) and 170(b)(1)(A)(I) (i.e., a church). In its September 17, 2004 letter, the IRS also reaffirmed the determination in its March 4, 1999 letter that PFM is an organization described in section 501(c)(3).

During 2010 and 2012, PFM's board had the following four members: Mr. Presley, who served as chairman of PFM's board; Ms. Presley; Mr. Moritz; and

---

[4]Universal Life Church "welcome[d] all who feel called to ministry to become ordained by completing our free online ordination."

[5]World Christianship Ministries considered itself the "[m]inistry of choice for sincere Christians seeking simple quick ordination."

[*6] Bobbi Hamilton, who was a friend of Mr. Presley. During those years, Mr. Presley served as the president of PFM, and Ms. Presley held the title "secretary" of PFM.

Although Ms. Presley was a member of PFM's board and held the title "secretary" of PFM, she did not perform the duties of those respective offices[6] and did not attend any meetings of PFM's board, including any telephone meetings.[7] Instead, Mr. Presley generally informed Ms. Presley that he had spoken informally with each of Mr. Moritz and Bobbi Hamilton, the two other members of PFM's board, before the respective dates that were shown in certain minutes of PFM board meetings as the respective dates of meetings of that board.

Moreover, although Mr. Moritz and Bobbi Hamilton were members of PFM's board, they did not always attend meetings, if any, of that board, including telephone meetings, and thus did not vote at any such meetings of PFM's board

---

[6]For example, although minutes of PFM's board that are in the record show that Ms. Presley signed those minutes, she did not sign them and did not know who did.

[7]We have very serious questions based upon our review of the record whether any of the meetings of PFM's board with respect to which the record contains minutes in fact took place.

[*7] that they did not attend.[8]  In order to ascertain their respective views on a particular matter relating to PFM, Mr. Presley discussed informally at times with each of Mr. Moritz and Bobbi Hamilton that particular matter, which was thereafter reflected in certain minutes of PFM's board as a topic of a meeting of PFM's board.

At all relevant times, including during 2010 and 2012, the Presleys provided about 95 percent of the total funding of PFM.  The Presleys also provided non-financial support of PFM.  Mr. Presley spent about 20 hours each week on certain activities and certain events relating to PFM, which generally took place in petitioners' residence.  For example, he conducted weekly worship services of PFM, which approximately 12 to 40 people attended.  Approximately 30 to 40 people participated regularly in the activities or the events that the Presleys hosted for PFM.  In addition, Mr. Presley at times performed weddings and baptisms and distributed communion.  He also met with young adults, taught classes, and conducted Bible studies three evenings each week.  Ms. Presley spent about four to five hours each week on certain activities and certain events relating to PFM.  For example, she taught Bible studies and prepared meals for attendees of certain activities or certain events of PFM that the Presleys held at petitioners' residence.

---

[8]See supra note 7.

[*8]   Over the years since the Presleys, Mr. Moritz, and Ms. Coffin had incorporated PFM until the date of the trial in this case, the Presleys organized on behalf of PFM about 15 to 17 trips to remote and impoverished areas of certain foreign countries (PFM's mission trips).  During PFM's mission trips, Mr. Presley, inter alia, preached the Gospel and provided free eye examinations and free eyeglasses to some of the residents of those areas.  In order to prepare for PFM's mission trips, the Presleys trained a group of volunteers, helped them raise funds, and donated about $40,000 to $50,000 each year from Mr. Presley's optometry businesses in order to help pay for those trips.[9]  In 2010 and 2012, respectively, the Presleys organized PFM's mission trips to Bogotá, Colombia, and Panama.

PFM owned a 21.85-acre tract of land in Tulsa (PFM's Tulsa property) that it had acquired in March 1998.[10]  There were several buildings on PFM's Tulsa property.  A caretaker lived in one of those buildings.  The Presleys sometimes used the basement in one of the buildings on PFM's Tulsa property to conduct

---

[9]Some of the volunteers ultimately repaid some or all of the funds that the Presleys donated for PFM's mission trips by working for PFM Farms, LLC (PFM Farms), a for-profit corporation that Mr. Presley organized and wholly owned (discussed below).

[10]PFM's Tulsa property had three different addresses, one of which was 5312 W. 41st Street.  That address was used not only for PFM but also for petitioners and PFM Farms.

[*9] certain meetings and to host certain activities on behalf of PFM. Mr. Presley and/or an individual whom he retained used one or more of the buildings on PFM's Tulsa property as office space for the conduct of certain administrative and office work that PFM had. Mr. Presley and/or Mr. Presley's optometry businesses leased from PFM and used one or more buildings on PFM's Tulsa property as office space where certain administrative and office work of those businesses was conducted. In addition, Mr. Presley and/or PFM Farms used a building on PFM's Tulsa property as office space where certain administrative and office work of PFM Farms was conducted. Wes Douglas (Mr. Douglas), who did certain work for Mr. Presley, PFM, Mr. Presley's optometry businesses, and/or PFM Farms worked in one or more of the buildings on PFM's Tulsa property and performed, inter alia, bookkeeping services for the Presleys, PFM, and/or Mr. Presley's optometry businesses.

Sometime before February 2007, Mr. Presley concluded that he should start raising soft fruits on a portion of PFM's Tulsa property. At Mr. Presley's request, David Dryer (Mr. Dryer), his attorney,[11] prepared a document which was titled "Minutes of Special Meeting of the Board of Trustees of Presley Family Minis-

---

[11]As discussed below, Mr. Dryer prepared the minutes of each meeting of PFM's board which Mr. Presley informed Mr. Dryer took place and with respect to which Mr. Presley asked Mr. Dryer to prepare minutes.

**[*10]** tries, Inc.", and which was dated February 4, 2007 (February 4, 2007 minutes). Those minutes indicated that a meeting of PFM's board was held on February 4, 2007, "for the purpose of discussing potential avenues to assist missionaries with the financing of their local and overseas mission projects." The February 4, 2007 minutes stated that all four members of PFM's board (namely, Mr. Presley, Ms. Presley, Mr. Moritz, and Bobbi Hamilton) were present at the meeting in person or by telephone.[12] The February 4, 2007 minutes further stated in pertinent part:

> The first order of business related to the discussion of potential avenues to assist missionaries with the financing of their local and overseas mission projects.
>
> The Board reviewed various funding methods that would allow Presley Family Ministries, Inc., and various missionary groups to work hand-in-hand to obtain funds for their mission goals and other long-term exempt activities of the organization. The Board determined that the growing of soft fruits is a highly lucrative method of obtaining funding for long-term mission goals. The following resolution was adopted by unanimous vote of the Board of Trustees of Presley Family Ministries, Inc.:
>
> **BE IT RESOLVED** the Board of Trustees of Presley Family Ministries, Inc., directs the President of Presley Family Ministries, Inc., to obtain additional information over the upcoming years in

---

[12]We have found that although Ms. Presley was a member of PFM's board and had the title "secretary" of PFM, she did not perform the duties of those respective offices and did not attend any meetings of PFM's board, including any telephone meetings. In addition, see <u>supra</u> note 7.

**[*11]** order to determine the feasibility of using a portion of the property [PFM's Tulsa property] as a farm for growing soft fruits.

Pursuant to the February 4, 2007 minutes, Mr. Presley continued to consider the feasibility of using a portion of PFM's Tulsa property as a farm for growing soft fruits. He was aware that PFM's Tulsa property had clay soil, some deep ravines, and no usable water source for irrigation such as ponds. Consequently, Mr. Presley concluded that, in order to produce soft fruits, substantial land improvement and development work, including the creation of one or more ponds for irrigation, was required on certain portions of PFM's Tulsa property, including the portion that was to be designated for any such production (required land improvement work).

Mr. Presley informed Mr. Dryer of his desire to grow soft fruits on PFM's Tulsa property and of the condition of that property, which necessitated that the required land improvement work be done before any attempt to produce soft fruit on PFM's Tulsa property began. Instead of his undertaking the required land improvement work directly, Mr. Presley followed the advice of Mr. Dryer, who recommended the creation of an entity such as a limited liability company that would perform that work and that would provide some liability protection to Mr.

**[*12]** Presley in the event of, for example, a worker's personal injury resulting from the performance of that work.

Pursuant to Mr. Dryer's advice, in April 2007 Mr. Presley organized and wholly owned PFM Farms under the laws of the State of Oklahoma as a for-profit, single-member limited liability company for the purpose of growing blueberries or other soft fruits on PFM's Tulsa property. Mr. Presley structured PFM Farms as a flow-through disregarded entity for tax purposes so that any of its gains or losses would flow through to him and be reported in Schedule F, Profit or Loss From Farming (Schedule F), of any return that he filed. Success Vision Services, Inc., one of Mr. Presley's optometry businesses, served as the manager of PFM Farms.

On January 10, 2008, PFM Farms leased from PFM for an initial term of ten years and an additional term of five years (PFM Farms' lease) approximately four to five acres of PFM's Tulsa property (leased PFM property) for the purpose of growing blueberries on those leased acres.[13] (We shall sometimes refer to the intended use of the leased PFM property by PFM Farms as PFM Farms' blueberry farm.)

---

[13]Mr. Presley signed the PFM Farms' lease as both the president of PFM and the president of Success Vision Services, Inc., PFM Farms' manager.

[*13] Pursuant to PFM Farms' lease, PFM Farms was required to pay PFM annual rent of $1,000. However, the following statements appear in a document titled "Minutes of Annual Meeting of the Board of Trustees of Presley Family Ministries, Inc.", which was dated April 13, 2008:

> The first order of business related to payment of rent from PFM Farms to the ministry [PFM] under the cropland [PFM Farms'] lease. After due notice and review of the crop lease and the activity on the property it was the board's decision that all or a portion of the rent may be paid in kind with soft fruit crops.

Sometime before or in 2009, Mr. Presley asked his son, Chris Presley, to prepare a business plan for the improvement and the development of PFM's Tulsa property for the purpose of operating PFM Farms' blueberry farm on the leased PFM property. Chris Presley prepared that business plan in 2009 or 2010. (We shall refer to the business plan that Chris Presley prepared as PFM Farms' business plan.) In PFM Farms' business plan, Chris Presley projected that PFM Farms would generate a profit of $357,300 over a ten-year period. Chris Presley stated in pertinent part in PFM Farms' business plan:

> Berryhill Blueberries will be a division of PFM Farms and will be a pick your own blueberry farm located in Tulsa, Oklahoma. The farm will provide the local community with a source of fresh hand picked blueberries while also allowing the local community to be a part of funding global medical missions.

[*14]     All profit generated from the blueberry farm will be used to fund medical mission trips.  The farm will mostly be staffed by volunteers who are either raising money for their own mission trip or helping raise money for one of their friends.

## Objectives

Berryhill Blueberries keys to success include the following:

- Excellent product
- Family Friendly environment
- Growth and maintenance of a social network
- Becoming an established farm with high production per acre

## Financial Objectives

- Breakeven within 5 years
- Create a long term and profitable revenue source that can be staffed by volunteers and future missionaries

## Marketing Objectives

- Gain awareness throughout Tulsa community
- Be identified as healthy, friendly and socially minded
- Develop a loyal base of customers and maintain contact via social media

## The Path to Success

Local and community farms are becoming increasingly popular; hence, Berryhill Blueberries is harnessing a great opportunity to become a well known and accepted blueberry farm because of the following characteristics:

- ✓ Blueberries will be locally grown using the type of blueberry plants that produce the best tasting

blueberries in Oklahoma (tests will be done to ensure the optimal type of blueberry bushes are used).
   ✓ Berryhill Blueberries realizes the trend and the importance of community and will take the necessary steps to market itself in this manner.
   ✓ Berryhill Blueberries has positioned itself as a socially minded business, which will create a huge marketing advantage.

Critical success factors for Berryhill Blueberries include operational funding, superior sales personnel, high-quality management, strong branding, top-notch research and development, affiliation with proper alliances in the area, addressing specific needs of the business community and public, and adequate marketing and promotion.

**Business Ownership**

Berryhill Blueberries, will be organized as an LLC named PFM Farms. It will be owned by Richard Presley.

\*       \*       \*       \*       \*       \*       \*

**Financial Overview**

Because Blueberries don't reach maturity for 5 years and because of the phased approach PFM Farms will use to minimize risk, it is forecasted that Berryhill Blueberries won't realize a profit until year 5 and won't fully breakeven until year 8. After year 8, the estimated annual profit will be approximately $185K \* \* \*

\*       \*       \*       \*       \*       \*       \*

**[\*16]  Start-up Expenses**

Berryhill Blueberries will realize approx. $125K in initial start up expenses within the first 12 to 18 months.  The major expenses are as follows:

Initial Start Up Expenses
1.    Landscape Supplies & Equipment
2.    Dirt Work & Pond Construction
3.    Research & Travel (Trips to Oregon, Florida and New Jersey)
4.    800 Blueberry Plants (1 acre)
5.    Irrigation & Pesticides
6.    Labor & Other Misc
7.    Marketing & Promotion Expenses

In PFM Farms' business plan, Chris Presley proposed that PFM Farms plant blueberry plants in three phases in order to mitigate any financial losses and crop losses.  PFM Farms' business plan contained three charts which showed, inter alia, the duration of each phase and the projected profit or loss during each year of each phase.  According to PFM Farms' business plan, during the first phase PFM Farms was to prepare the leased PFM property for the planting of blueberries and then test multiple types of blueberry plants on one acre of that leased property in order to determine the type(s) of blueberry plants that "will thrive in the Oklahoma climate."

Pursuant to PFM Farms' business plan, during the second phase, which, depending on the success that PFM Farms had during the first phase, would start

[*17] in the third year, PFM was to undertake the planting of blueberry plants on an additional four acres.

Pursuant to PFM Farms' business plan, during the third phase, which, depending on the success that PFM Farms had during the first phase, would start in the fourth year, PFM was to prepare an additional five acres[14] for the planting of blueberry plants and then was to undertake the planting of blueberry plants on those additional five acres.

At a time not established by the record, PFM Farms' business plan was updated.[15] That updated PFM Farms' business plan stated in pertinent part:

**Business Update**

The original plan and intent of PFM Farms was to use the learning from the 1 acre of bushes planted in year 1 to add an additional 4 acres of blueberries in year 3. Unfortunately the first acre of blueberries that were planted died due to suboptimal soil PH levels. This has delayed phase 2 by an additional year. * * *

_____

[14]As discussed above, PFM Farms leased from PFM under PFM Farms' lease only about four to five acres of PFM's Tulsa property. It is unclear from the record why Chris Presley included in PFM Farms' business plan a third phase which addressed an additional five acres of PFM's Tulsa property that PFM had not leased to PFM Farms under PFM Farms' lease or any other lease in the record.

[15]The record does not establish whether Chris Presley or another person updated PFM Farms' business plan.

**[*18]** Like PFM Farms' business plan, the updated PFM Farms' business plan contained three charts which showed, inter alia, the duration of each phase and the projected profit or loss during each year of each phase, as affected and updated by the effects on each of those phases of the failure of the first year's planting of blueberry plants. Those charts showed delays in the starting of the second phase and the third phase as well as a reduction of profit over a ten-year period from $357,300, as reflected in PFM Farms' business plan, to $156,300, as reflected in the updated PFM Farms' business plan.

During years before 2010, including 2008 and/or 2009, PFM Farms performed the required land improvement work and paid the cost of that work. The required land improvement work that PFM Farms performed on PFM's Tulsa property included work relating to (1) creating two ponds in an area of PFM's Tulsa property other than the leased PFM property and building a pump house, both of which were to be used in the installation of an irrigation system for PFM Farms' blueberry farm that PFM Farms intended to operate for profit on the leased PFM property; (2) filling ravines with dirt and leveling the land where ravines had existed; and (3) mulching that land.[16]

---

[16]PFM Farms needed a power source to operate the irrigation system that would bring water from the ponds to the leased PFM property that was required

(continued...)

[*19] Mr. Dryer's Representation

Mr. Dryer's representation of Mr. Presley began around the mid-1990s and thereafter expanded to representing the Presleys, Mr. Presley's optometry businesses, PFM, and PFM Farms (Mr. Dryer's representation). Mr. Dryer has substantial experience that started during 1993 in, inter alia, providing legal services to nonprofit organizations, including nonprofit organizations that are exempt from tax (nonprofit experiences). Mr. Dryer's nonprofit experiences included providing advice as to (1) the deductibility as charitable contributions for tax purposes of certain donations to tax-exempt organizations and (2) the reasonableness of the compensation packages that nonprofit organizations provided to their directors and officers, including compensation packages that provided housing or housing allowances.

Mr. Dryer's representation included providing advice and preparing documents with respect to (1) Mr. Presley's optometry businesses; (2) the organization and the operation of PFM, including the obtaining of its tax exemption from the

---

[16](...continued)
for the success of PFM Farms' blueberry farm. As of the time of the trial in this case, the city of Tulsa had not issued a permit authorizing a power source for the operation of that irrigation system. As of the time of trial, PFM Farms was using water from the city of Tulsa to irrigate PFM Farms' blueberry farm, which was expensive to do.

**[*20]** IRS and the preparation at all relevant times of virtually all, if not all, of certain of the minutes of meetings of PFM's board that Mr. Presley informed Mr. Dryer took place;[17] (3) the organization and the operation of PFM Farms; and (4) the requirements for entitlement to tax deductions for contributions to or on behalf of PFM and certain other charitable organizations.

<u>Claimed Charitable Contributions at Issue</u>

At Mr. Presley's request, Mr. Dryer prepared and sent to Mr. Presley (or his designee) around late September 2010 a document which was titled "Minutes of Special Meeting of the Board of Trustees of Presley Family Ministries, Inc." and which was dated October 20, 2010 (October 20, 2010 minutes).[18] Those minutes indicated that a meeting of PFM's board was held on October 20, 2010, "for the purpose of reviewing the proposed donation of a tractor and land and soil preparation." The October 20, 2010 minutes stated that all four members of PFM's board (namely, Mr. Presley, Ms. Presley, Mr. Moritz, and Bobbi Hamilton) were present

---

[17]For each meeting of PFM's board which Mr. Presley informed Mr. Dryer took place and with respect to which Mr. Presley asked Mr Dryer to prepare minutes, Mr. Dryer provided Mr. Presley with a questionnaire which Mr. Presley completed and returned to Mr. Dryer and on which Mr. Dryer relied in preparing the minutes of any such meeting.

[18]The record does not explain why Mr. Dryer prepared minutes around late September 2010 for a meeting of PFM's board that purported to take place on October 20, 2010.

**[\*21]** at the meeting in person or by telephone.[19]  The October 20, 2010 minutes further stated in pertinent part:

> The first order of business related to reviewing the proposed donation of the proposed donation [sic] of a tractor and land and soil preparation in order to develop ministry land for future needs in accord with its exempt purpose.
>
> The Board of Trustees reviewed the proposed donation and the following resolution was adopted by unanimous vote of the Board of Trustees of Presley Family Ministries, Inc.:
>
> **BE IT RESOLVED** that the Board of Trustees of Presley Family Ministries, Inc. hereby approves the donation of a tractor and land and soil preparation from the donor, Dr. Richard Presley.  The Board has directed the donor to obtain his own appraisal for purposes of valuation.  The Board also indicated that Presley Family Ministries, Inc. cannot establish the value of this donated asset.  The Board further directs its corporate officers to execute the appropriate section of IRS Form 8283 when the same is presented by the donor.

Mr. Dryer intentionally included as part of the resolution quoted above the sentence regarding PFM's board's "direct[ing] the donor to obtain his own appraisal for purposes of valuation" and the last sentence regarding PFM's board's directing "its corporate officers to execute the appropriate section of IRS Form 8283 when the same is presented by the donor."  (We shall refer to the sentence regarding the donor's obtaining an appraisal quoted from the October 20, 2010 minutes as the Form 8283 appraisal requirement language.  We shall refer to the

---

[19]See supra notes 7 and 12.

**[*22]** last sentence quoted from the October 20, 2010 minutes as the Form 8283 donor acknowledgement requirement language.) That was because he wanted the Form 8283 appraisal requirement language and the Form 8283 donor acknowledgement requirement language to serve as an important reminder to obtain an appraisal of any substantial noncash property donated to PFM and to include a properly completed and executed Form 8283, Noncash Charitable Contributions, with petitioners' 2010 return because of petitioners' proposed donations to PFM of "a tractor and land and soil preparation".

Around the same time in late September 2010 when Mr. Dryer prepared the October 20, 2010 minutes at Mr. Presley's request, he also prepared at Mr. Presley's request and sent to him (or his designee) an undated and unsigned letter that was addressed to PFM Farms (Mr. Dryer's draft 2010 letter No. 1).[20] The body of Mr. Dryer's draft 2010 letter No. 1 stated: "This is to acknowledge and thank you for your support of Presley Family Ministries during 2010. You donated the beautiful water ponds to the ministry enabling our youth and others to

---

[20]Although Mr. Dryer's draft 2010 letter No. 1 was unsigned when he provided it to Mr. Presley (or his designee), the copy of that letter that is in the record contains what purports to be the signature of Mr. Douglas. The record does not establish whether Mr. Douglas signed Mr. Dryer's draft 2010 letter No. 1 or if he did, when he signed that letter.

[*23] enjoy water sports, fishing, wildlife, and the beautiful setting.  This provides a wonderful ministry setting and we thank you."

Mr. Dryer's draft 2010 letter No. 1 did not show the value of the "donated water ponds".  Nor did Mr. Dryer's 2010 draft letter No. 1 make any reference to a tractor, a tractor/mower, a mower, or other similar equipment.  The following language appeared at the bottom of Mr. Dryer's draft 2010 letter no. 1:  "No goods or services were provided for the contributions given."

At one or more times not established by the record, Mr. Dryer or Mr. Douglas used Mr. Dryer's draft 2010 letter No. 1 as a model to prepare two additional undated and unsigned letters (PFM's two additional letters).[21]  Each of PFM's two additional letters, which were identical except in one material respect, stated in pertinent part:  "This is to acknowledge and thank you for your support of Presley Family Ministries during 2010.  You donated the equipment and beautiful water ponds to the ministry enabling our youth and others to enjoy water sports,

---

[21]We found the record to be unclear as to whether it was Mr. Dryer or Mr. Douglas who used Mr. Dryer's draft 2010 letter No. 1 as a model to prepare PFM's two additional letters.  If it was Mr. Dryer who prepared one or both of PFM's two additional letters, neither of them was signed when he provided it to Mr. Presley (or his designee), although the copies of PFM's two additional letters that are in the record contain what purports to be the signature of Mr. Douglas.  The record does not establish whether Mr. Douglas signed one or both of PFM's two additional letters or if he did, when he signed one or both of those letters.

**[*24]** fishing, wildlife, and the beautiful setting.  This provides a wonderful ministry setting and we thank you."  The following language appeared at the bottom of PFM's two additional letters:  "No goods or services were provided for the contributions given."

One of PFM's two additional letters further stated:

Your donation of the following items was designated to have a total value of $110,364.

Tractor/Mower - $3,000
Land/Pond Work[22] - $107,364

(We shall refer to the letter claiming a total value of $110,364 for claimed donations to PFM as PFM's draft letter No. 2.)  Mr. Dryer did not prepare and was not responsible for any language in PFM's draft letter No. 2 that purported to show (1) "Tractor/Mower" and "Land/Pond Work " as the nature of what that letter claimed was donated to PFM and (2) the respective values of those two claimed donations.

The other of PFM's two additional letters further stated:

Your donation of the following items was designated to have a total value of $153,000.

Tractor/Mower - $3,000

---

[22]The description "Land/Pond Work" is inconsistent with the following description of the property that PFM purportedly received that appeared in the same letter:  "beautiful water ponds [donated] to the ministry enabling our youth and others to enjoy water sports, fishing, wildlife, and the beautiful setting."

**[*25]** Land/Pond Work[23] - $150,000

(We shall refer to the letter claiming a total value of $153,000 for claimed donations to PFM as PFM's draft letter No. 3.) Mr. Dryer did not prepare and was not responsible for any language in PFM's draft letter No. 3 that purported to show (1) "Tractor/Mower" and "Land/Pond Work " as the nature of what that letter claimed was donated to PFM and (2) the respective values of those two claimed donations.

At Mr. Presley's request, Mr. Dryer prepared and sent to Mr. Presley (or his designee) a document which was titled "Minutes of Special Meeting of the Board of Trustees of Presley Family Ministries, Inc." and which was dated April 20, 2012 (April 20, 2012 minutes). Those minutes indicated that a meeting of PFM's board was held on April 20, 2012, "for the purpose of reviewing the proposed donation of a certain parcel of land located in Tulsa County [i.e., petitioners' residence]." The April 20, 2012 minutes stated that all four members of PFM's board (namely, Mr. Presley, Ms. Presley, Mr. Moritz, and Bobbi Hamilton) were present at the meeting in person or by telephone.[24] The April 20, 2012 minutes further

---

[23]The description "Land/Pond Work" is inconsistent with the following description of the property that PFM purportedly received that appeared in the same letter: "beautiful water ponds [donated] to the ministry enabling our youth and others to enjoy water sports, fishing, wildlife, and the beautiful setting."

[24]See supra notes 7 and 12.

**[*26]** stated in pertinent part with respect to the proposed donation of petitioners'

residence:

> **BE IT RESOLVED** that the Board of Trustees of Presley Family Ministries, Inc. has reviewed the potential costs associated with the maintenance of the property located at 3724 S 74th West P1 Tulsa OK 74107-4857 and has considered the auxiliary issues related to holding title to such property. Based on a review of these considerations, the Board hereby approves the donation of the above referenced property. The Board has directed the donor to obtain his own appraisal for purposes of valuation. The Board also indicated the Presley Family Ministries, Inc. cannot establish the value of this donated asset. The Board further directs its corporate officers to execute the appropriate section of IRS Form 8283 when the same is presented by the donor.

> **BE IT FURTHER RESOLVED** that the Board of Trustees of Presley Family Ministries, Inc. hereby approves the donation and accepts the donation of the real property described as:

> > Lot Seventeen (17), Block One (1), ROLLING OAKS SOUTH III, an Addition to the City of Sand Springs, Tulsa County, State of Oklahoma, according to the Recorded Plat thereof a/k/a 3724 S 74th West P1 Tulsa OK 74107-4857

Mr. Dryer included as part of the first resolution quoted above the sentence

regarding PFM's board's "direct[ing] the donor to obtain his own appraisal for

purposes of valuation." That is the same language which appeared in the October

20, 2010 minutes and to which we refer as the Form 8283 appraisal requirement

language. Mr. Dryer included as part of the first resolution in the April 20, 2012

minutes quoted above the last sentence regarding PFM's board's "direct[ing] its

[*27] corporate officers to execute the appropriate section of IRS Form 8283 when the same is presented by the donor." That is the same language which appeared in the October 20, 2010 minutes and to which we refer as the Form 8283 donor acknowledgement requirement language. Mr. Dryer included the Form 8283 appraisal requirement language and the Form 8283 donor acknowledgement requirement language in the April 20, 2012 minutes for the same reasons he included that language in the October 20, 2010 minutes. That is to say, Mr. Dryer included the Form 8283 appraisal requirement language and the Form 8283 donor acknowledgement requirement language in the April 20, 2012 minutes because he wanted that language to serve as an important reminder to obtain an appraisal of any substantial noncash property donated to PFM and to include a properly completed and executed Form 8283 with petitioners' 2012 return because of petitioners' proposed donation to PFM of petitioners' residence.

On April 30, 2012, pursuant to a general warranty deed (petitioners' deed) that Mr. Dryer had prepared, petitioners transferred to PFM legal title to petitioners' residence.[25] At the time of that transfer, petitioners' residence was free of any encumbrances. At the time they transferred legal title to petitioners' residence to

_____

[25]Petitioners delivered petitioners' deed to PFM on April 30, 2012. Petitioners' deed was not recorded with the Tulsa County clerk's office until July 26, 2012.

[*28] PFM, petitioners expected to continue living in petitioners' residence without paying any rent to PFM for the right to do so. They also expected at that time to continue paying any utility bills relating to petitioners' residence (utility bills). From the time they executed petitioners' deed until at least the time of the trial in this case, petitioners continued to live in petitioners' residence and to pay all utility bills and never paid any rent to PFM for the right to live in that residence.[26]

At Mr. Presley's request, Mr. Dryer prepared and sent to Mr. Presley (or his designee) a document which was titled "Minutes of Special Meeting of the Board of Trustees of Presley Family Ministries, Inc." and which was dated May 25, 2012 (May 25, 2012 minutes). Those minutes indicated that a meeting of PFM's board was held on May 25, 2012, "for the purpose of reviewing the proposed donation of a certain parcel of land located in Tulsa County [i.e., petitioners' residence]." The May 25, 2012 minutes stated that all four members of PFM's board (namely, Mr. Presley, Ms. Presley, Mr. Moritz, and Bobbi Hamilton) were present at the meet-

---

[26]The parties stipulated that petitioners lived in petitioners' residence until March 30, 2015. That stipulation is clearly contrary to other evidence in the record on which we found that petitioners were living in petitioners' residence at the time of the trial in this case, which was in September 2017. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

[*29] ing in person or by telephone.[27]  The May 25, 2012 minutes further stated in pertinent part:

> **BE IT RESOLVED** that the Board of Trustees of Presley Family Ministries, Inc. has reviewed the request of its pastor Dr. Richard Presley to utilize the above referenced property as a parsonage.  It was approved in lieu of paying a full housing allowance to the pastor, Dr. Richard Presley, that Dr. Richard Presley and his family be allowed to use the property located at 3724 S 74th West P1 Tulsa OK 74107-4857 as a parsonage and for other church related activities.[28]

On December 5, 2013, Ronald Scott (Mr. Scott), a residential real estate appraiser who was certified by the State of Oklahoma, signed an appraisal report (Mr. Scott's December 5, 2013 appraisal report) which he prepared and in which he indicated that the date of that report was December 5, 2013, the same date on which he signed it.  In Mr. Scott's December 5, 2013 appraisal report, Mr. Scott used the market approach, also known as the comparable sales approach, and opined that the fair market value of petitioners' residence as of May 10, 2012,[29]

---

[27]See supra notes 7 and 12.

[28]The May 25, 2012 minutes further stated that Mr. Presley and Ms. Presley abstained from voting on the resolution adopted at the meeting.

[29]Petitioners transferred, by executing petitioners' deed on April 30, 2012, and delivering it to PFM on the same date, legal title to PFM of petitioners' residence. The record does not explain why Mr. Scott used May 10, 2012, as the date as of which he valued petitioners' residence.

**[*30]** was $236,000. Mr. Scott's December 5, 2013 appraisal report stated in

pertinent part:

> THE INTENDED USER OF THIS APPRAISAL IS THE LENDER/
> CLIENT. THE INTENDED USE IS TO EVALUATE THE PROP-
> ERTY THAT IS THE SUBJECT OF THIS APPRAISAL FOR A
> MORTGAGE FINANCE TRANSACTION, SUBJECT TO THE
> STATED SCOPE OF WORK, PURPOSE OF THE APPRAISAL,
> REPORTING REQUIREMENTS OF THIS APPRAISAL REPORT
> FORM AND DEFINITION OF MARKET VALUE, NO ADDITION-
> AL INTENDED USERS ARE IDENTIFIED BY THE APPRAISER.
>
> *        *        *        *        *        *        *
>
> **INTENDED USE**: The intended use of this appraisal report is for
> the lender/client to evaluate the property that is the subject of this
> appraisal for a mortgage finance transaction.
>
> **INTENDED USER**: The intended user of this appraisal report is the
> lender/client.

Mr. Scott's December 5, 2013 appraisal report identified both the "Borrower" and

the "Lender/Client" as PFM.

Mr. Scott's December 5, 2013 appraisal report did not mention or acknowl-

edge that (1) petitioners transferred to PFM on April 30, 2012, legal title to peti-

tioners' residence; (2) from the time they transferred legal title to petitioners' resi-

dence to PFM until at least December 5, 2013, the date of Mr. Scott's December 5,

2013 appraisal report, petitioners continued to live in petitioners' residence and to

pay all utility bills and did not pay any rent to PFM for the right to live in that resi-

[*31] dence; and (3) Mr. Scott's December 5, 2013 appraisal report was to be used for tax purposes to support the claimed fair market value of petitioners' claimed charitable contribution to PFM of petitioners' residence on April 30, 2012.

Around the same time Mr. Dryer prepared the April 20, 2012 minutes and petitioners' deed at Mr. Presley's request, he also prepared at Mr. Presley's request and sent to him (or his designee) an undated and unsigned letter with respect to petitioners' residence that was addressed to the Presleys (Mr. Dryer's draft letter regarding petitioners' residence).[30] The body of Mr. Dryer's draft letter regarding petitioners' residence stated: "This is to acknowledge your donation of the house and property located at 3724 S 74th W Place Tulsa, OK 74107 [petitioners' residence]." The following language appeared at the bottom of Mr. Dryer's draft letter regarding petitioners' residence: "No goods or services were provided for the contributions given." Mr. Dryer's draft letter regarding petitioners' residence did not show the value of that residence.

---

[30]Although Mr. Dryer's draft letter regarding petitioners' residence was undated and unsigned when he provided it to Mr. Presley (or his designee), the copy of that letter that is in the record contains what purports to be the date of October 12, 2012, and the signature of Mr. Douglas. The record does not establish whether Mr. Douglas signed Mr. Dryer's draft letter regarding petitioners' residence or if he did, when. Nor does the record establish that Mr. Dryer's draft letter regarding petitioners' residence signed by Mr. Douglas that is in the record was sent by PFM on or shortly after October 12, 2012.

[*32] At some time after December 5, 2013, the date on which Mr. Scott signed and issued Mr. Scott's December 5, 2013 appraisal report, Mr. Douglas used Mr. Dryer's draft letter regarding petitioners' residence to prepare a letter that showed the date of October 12, 2012 (Mr. Douglas' draft letter dated October 12, 2012). Mr. Douglas' draft letter dated October 12, 2012 was identical to Mr. Dryer's draft letter regarding petitioners' residence except that it was dated October 12, 2012, and contained the following statement: "The appraised value of the house [petitioners' residence] is $236,000." Mr. Dryer did not prepare and was not responsible for any language in Mr. Douglas' draft letter dated October 12, 2012, that purported to show the value of petitioners' residence.

Certain Tax Returns and Certain Tax Return Preparers of Petitioners

Petitioners generally did not prepare their individual tax returns or the S corporation tax returns of Mr. Presley's optometry businesses. Instead, they generally retained return preparers to prepare those tax returns.

The Presleys retained on a computer server (server) virtually all, if not all, of the records pertaining to Mr. Presley's optometry businesses, PFM, PFM Farms, and themselves. The Presleys allowed certain individuals who worked for Mr. Presley's optometry businesses, PFM, PFM Farms, and/or themselves, including Mr. Douglas, Mr. Dryer, and the individual who prepared their tax return

[*33] and any amended tax return for each of their taxable years 2010 and 2012 (the two years at issue), to have access to that server.

Sometime on or after October 20, 2009, petitioners filed Form 1040, U.S. Individual Income Tax Return (Form 1040), for their taxable year 2008 (2008 return), which Shauna Wortinger, a certified public accountant (C.P.A.) and a so-called paid return preparer, had prepared.

In their 2008 return, petitioners reported total income of $203,997. In calculating that total income, petitioners reduced other items of income that they reported in their 2008 return by a claimed farm loss of $65,666.

As required because petitioners claimed in their 2008 return a farm loss of $65,666, petitioners included with that return Schedule F (2008 Schedule F). In their 2008 Schedule F, petitioners showed Mr. Presley as the proprietor and blue-berries as the principal product of the business to which that schedule pertained. In their 2008 Schedule F, petitioners reported no income and claimed $65,666 of total expenses and a loss of the same amount.

Sometime on or after April 8, 2011, petitioners filed Form 1040X, Amended U.S. Individual Income Tax Return, for their taxable year 2008 (amended 2008 return), which Robert A. Johnson (Mr. Johnson), a C.P.A. and an employee of the Presleys, Mr. Presley's optometry businesses, and/or PFM Farms, had prepared.

[*34] Mr. Johnson prepared petitioners' amended 2008 return in his capacity as an employee of petitioners, Mr. Presley's optometry businesses, and/or PFM Farms, not as a paid return preparer.

Petitioners included an attachment with their amended 2008 return that stated, inter alia: "Farm Income and Expense was incorrectly reported on the taxpayer's [sic] 2008 Form 1040 as originally prepared." The amount of $65,666, which was the amount of the farm loss that petitioners claimed in their 2008 return and in their 2008 Schedule F, appeared next to that statement in that attachment to their amended 2008 return.

Petitioners filed Form 1040 for their taxable year 2009 (2009 return).[31] In their 2009 return, petitioners reported total income of $813,776. In calculating that total income, petitioners reduced other items of income that they reported in their 2009 return by a claimed farm loss of $1,402.

As required because petitioners claimed in their 2009 return a farm loss of $1,402, petitioners included with their 2009 return Schedule F (2009 Schedule F). In their 2009 Schedule F, petitioners showed Mr. Presley as the proprietor and blueberries as the principal product of the business to which that schedule per-

---

[31]The copy of petitioners' 2009 return in the record does not identify any return preparer.

[*35] tained. In their 2009 Schedule F, petitioners reported no income and claimed $1,402 of total expenses and a loss of the same amount.

On September 15, 2011, petitioners filed Form 1040 for their taxable year 2010 (2010 return), which Mr. Johnson had prepared. Mr. Johnson prepared petitioners' 2010 return in his capacity as an employee of petitioners, Mr. Presley's optometry businesses, and/or PFM Farms, not as a paid return preparer.

In their 2010 return, petitioners reported total income of $698,721. In calculating that total income, petitioners reduced other items of income that they reported in their 2010 return by a claimed farm loss of $45,995.

Petitioners included Schedule A, Itemized Deductions, with their 2010 return (2010 Schedule A). In their 2010 Schedule A, petitioners claimed, inter alia, charitable contribution deductions totaling $337,114. Of that total amount of claimed charitable contribution deductions, petitioners indicated in their 2010 Schedule A that (1) $257,217 represented "[g]ifts by cash or check," (2) $4,145 represented gifts "[o]ther than cash or check," and (3) $75,752 represented a "[c]arryover from prior year".

As required because petitioners claimed in their 2010 return a farm loss of $45,995, petitioners included with their 2010 return Schedule F (2010 Schedule F). In their 2010 Schedule F, petitioners showed Mr. Presley as the proprietor

[*36] and blueberries as the principal product of the business to which that schedule pertained.  In their 2010 Schedule F, petitioners reported $129 of gross income and claimed $46,124 of total expenses and a loss of $45,995.

Petitioners included with their 2010 return Form 8283 (2010 Form 8283) relating to noncash charitable contributions claimed in their 2010 return.  Petitioners completed Section A, Donated Property of $5,000 or Less and Certain Publicly Traded Securities (2010 Section A), of their 2010 Form 8283.  In their 2010 Section A, petitioners showed noncash contributions to Goodwill Industries for filing cabinets, keyboards, a TV, linens, toys, clothes, books, a suitcase, and housewares and claimed a total value for those items of $3,179.  Nowhere in their 2010 Section A, their 2010 Form 8283, or in any other form, schedule, or attachment to their 2010 return did petitioners include any reference to or any information regarding a claimed charitable contribution deduction for a tractor/mower or any other similar equipment.  Nonetheless, petitioners included $3,000 for a tractor/mower (tractor/mower in question) as part of their claimed total charitable contribution deductions of $337,114 in their 2010 Schedule A.[32]  It was Mr. John-

---

[32]We are able to find that petitioners included $3,000 for the tractor/mower in question as part of their claimed total charitable contribution deductions of $337,114 only because the parties stipulated that fact, and not from petitioners' 2010 return.  It is not clear from our review of petitioners' 2010 return where in

(continued...)

[*37] son who calculated the amount that petitioners claimed as a charitable contribution deduction for the tractor/mower in question that petitioners had told him they contributed to PFM. He made that calculation on the basis of, inter alia, his review of the invoice for the purchase of the tractor/mower in question. He also reviewed on various websites the prices of other tractor/mowers that he considered to be similar in type and age to the tractor/mower in question. Mr. Johnson assigned a value of $3,000 to the tractor/mower in question because that value was between the highest price and the lowest price shown for such other similar tractor/mowers on the websites that he visited.[33]

Petitioners left blank the following parts of Section B (2010 Section B) of their 2010 Form 8283 relating to donated property valued over $5,000 (except certain publicly traded securities): Part I, Information on Donated Property (Part I); Part III, Declaration of Appraiser (Part III); and Part IV, Donee Acknowledgement (Part IV). Mr. Presley signed and dated September 15, 2011, Part II,

---

[32](...continued)
their 2010 Schedule A (or in any other part of their 2010 return) they claimed that deduction.

[33]The $3,000 value that Mr. Johnson believed was appropriate for petitioners to deduct for the tractor/mower in question was shown in each of PFM's draft letter No. 2 and PFM's draft letter No. 3 (discussed above) as the value of that tractor/mower.

[*38] Taxpayer (Donor) Statement (Part II), of their 2010 Section B.  Nowhere in their 2010 Schedule A, their 2010 Form 8283, or any other form, schedule, or attachment to their 2010 return did petitioners include any reference to or any information regarding a claimed charitable contribution deduction with respect to PFM Farms' blueberry farm, the required land improvement expenses that PFM Farms paid before 2010, the ponds that PFM Farms created on PFM's Tulsa property, or any other improvements that PFM Farms made to PFM's Tulsa property.  Nonetheless, petitioners included the required land improvement expenses of $107,364 that PFM Farms had paid before 2010 as part of their claimed deductions of $257,217 for charitable "[g]ifts by cash or check".[34]

When Mr. Johnson prepared petitioners' 2010 return, he was not aware that the reason PFM Farms created the ponds on PFM's Tulsa property was to provide irrigation to PFM Farms' blueberry farm, which PFM intended to operate on the PFM leased property.  When Mr. Johnson prepared petitioners' 2010 return, he was aware that PFM owned the property on which PFM Farms had created the

_____

[34]We are able to find that petitioners included the required land improvement expenses of $107,364 that PFM Farms had paid before 2010 as part of their claimed deductions of $257,217 for charitable "[g]ifts by cash or check" only because the parties stipulated that fact, and not from petitioners' 2010 return.  It is not clear from our review of petitioners' 2010 return where in their 2010 Schedule A (or in any other part of their 2010 return) they claimed that deduction.

**[\*39]** ponds and that PFM Farms was leasing certain acres on that property from PFM.

Mr. Johnson advised the Presleys that they should claim a charitable contribution deduction for the required land improvement expenses that PFM Farms had paid before 2010.[35] He gave them that advice because, as he explained to them, they should have deducted those expenses for taxable years before their taxable year 2010 but did not do so because of errors in the preparation of their 2008 return and their 2009 return. When Mr. Johnson advised petitioners to deduct the required land improvement expenses in their 2010 return, he had not

---

[35]In determining the amount that petitioners should claim in their 2010 return as a charitable contribution deduction for the required land improvement expenses that PFM Farms paid before 2010, Mr. Johnson and others began by reviewing invoices, canceled checks, and similar documents relating to those expenses. The parties stipulated that PFM Farms paid $119,182.36 of required land improvement expenses before 2010 and that petitioners deducted as a charitable contribution $107,364 of those expenses in their 2010 return. On brief, petitioners offer the following explanation for the difference between the amount of the required land improvement expenses that the parties stipulated PFM Farms paid before 2010 (i.e., $119,182.36) and the amount of those expenses that they deducted in their 2010 return (i.e., $107,364): "Petitioners did not take a deduction for the full amount of the expenses incurred ($119,182.36) as they applied a 10 percent discount to that total, resulting in a reported deduction of only $107,364 on their 2010 tax return." The amount claimed in petitioners' 2010 return as a charitable contribution for the required land improvement expenses that PFM Farms paid before 2010 (i.e., $107,364) was shown in PFM's draft letter No. 2 as the value of the "Land/Pond work" (discussed above). However, PFM's draft letter No. 3 (also discussed above) showed the value of the"Land/Pond work" as $150,000.

[*40] done any research regarding the propriety of a charitable contribution deduction for a taxpayer's expenses paid by the taxpayer before the year for which the deduction is claimed.

On November 19, 2013, respondent received from petitioners Form 1040X for their taxable year 2010 (2010 Form 1040X), which Kathy L. Burch (Ms. Burch), a C.P.A. and an attorney with a master's degree in taxation, had prepared.[36] Respondent did not process petitioners' 2010 return Form 1040X (unprocessed 2010 Form 1040X).

Petitioners included Form 1040 for taxable year 2010 with their unprocessed 2010 Form 1040X, which Ms. Burch had prepared and on which someone had stamped at the top of each page the words "AS AMENDED". (We shall refer to Form 1040 for taxable year 2010, which petitioners included with their unprocessed 2010 Form 1040X, as unprocessed amended 2010 return.) In their unprocessed amended 2010 return, petitioners reported total income of $676,891 and claimed, inter alia, in Schedule A (2010 amended Schedule A) charitable contribution deductions totaling $337,114. Of that total amount of charitable contribution deductions claimed in their 2010 amended Schedule A, petitioners indicated that

---

[36]Ms. Burch, who began representing petitioners sometime in 2010, had experience in providing advice, inter alia, with respect to tax-exempt organizations and the requirements for deducting charitable contributions.

[*41] (1) $332,969 represented "[g]ifts by cash or check" and (2) $4,145 represented gifts "[o]ther than cash or check.

Petitioners included with their unprocessed amended 2010 return Schedule F (unprocessed amended 2010 Schedule F). Petitioners' unprocessed amended 2010 Schedule F was identical in all material respects to their 2010 Schedule F that they had included with their 2010 return.

Petitioners did not include Form 8283 with their unprocessed amended 2010 return. Nowhere in their unprocessed amended 2010 return or in any form, schedule, or attachment to that return did petitioners include any reference to or any information regarding a claimed charitable contribution deduction with respect to PFM Farms' blueberry farm, the expenses that PFM incurred for the required land improvement work on PFM's Tulsa property, the ponds that PFM Farms created on the PFM leased property, any other improvements that PFM Farms made to PFM's Tulsa property, a tractor/mower, or any other similar equipment.

On October 15, 2013, petitioners timely filed Form 1040 for their taxable year 2012 (2012 return), which Ms. Burch had prepared. In their 2012 return, petitioners reported total income of $880,879. In calculating that total income, petitioners reduced other items of income that they reported in their 2012 return by a claimed farm loss of $27,259.

[*42] Petitioners included Schedule A with their 2012 return (2012 Schedule A). In their 2012 Schedule A, petitioners claimed, inter alia, charitable contribution deductions totaling $440,440. Of that total amount of charitable contribution deductions claimed, petitioners indicated in their 2012 Schedule A that (1) $267,213 represented "[g]ifts by cash or check" and (2) $235,422 represented gifts "[o]ther than cash or check".[37] The $235,422 claimed deduction for gifts "[o]ther than cash or check" was the charitable contribution deduction that petitioners claimed in their 2012 return with respect to petitioners' residence.

As required because petitioners claimed in their 2012 return a farm loss of $27,259, petitioners included with their 2012 return Schedule F (2012 Schedule F). In their 2012 Schedule F, petitioners showed Mr. Presley as the proprietor and blueberries as the principal product of the business to which that schedule pertained. In their 2012 Schedule F, petitioners reported $1,711 of gross income and claimed $28,970 of total expenses and a loss of $27,259.

Petitioners included with their 2012 return Section B only of Form 8283 (2012 Section B). In their 2012 Section B, petitioners completed Part I, the listing

---

[37]In addition, the following statement appeared on line 19 of their 2012 Schedule A, the line on which petitioners were required to show the total amount of gifts to charity that they were claiming for their taxable year 2012: "Disallowed contributions . . . . . [$]-62,195".

[*43] of information on the "donated" property, (1) by checking the box next to the preprinted phrase "Other Real Estate"; (2) by describing the "donated property" as a single family residence and its condition at the time of the "gift" as good; and (3) by representing (a) that the appraised fair market value of the "donated property" was $235,422, (b) that it was acquired in May 1992 by purchase, and (c) that the donor's cost or adjusted basis was $104,500. Petitioners left blank Part II, which was the donor statement. Part III, which was the declaration of the appraiser, was also left blank. Part IV, which was the donee acknowledgement, was partially completed and contained the following information: (1) the "donated" property was received by the donee on April 30, 2012; (2) the donee did not intend to use that property for an "unrelated use"; and (3) the donee was PFM.[38] No authorized representative of PFM (or any other individual) signed and dated Part IV of petitioners' 2012 Section B.

At times not disclosed by the record before petitioners filed their 2012 return, Mr. Dryer had done some research and had discussed with Mr. Presley (or his designee) on three different occasions whether he believed that petitioners should be entitled to a charitable contribution deduction with respect to their transferring

---

[38]The address of PFM was also shown in Part IV of petitioners' 2012 Section B.

**[*44]** to PFM legal title to petitioners' residence while continuing to live in that residence. Mr. Dryer's research included research as to whether PFM's allowing petitioners to continue to live in petitioners' residence as a parsonage (parsonage benefit) after they deeded that residence to PFM would constitute a so-called return benefit to them (i.e., a benefit that petitioners received from PFM in return for their deeding petitioners' residence to PFM), which would result in their not being entitled to deduct the value of petitioners' residence as a charitable contribution to PFM. Mr. Dryer concluded on the basis of his research that petitioners' continuing to live in petitioners' residence after they deeded it to PFM should not be considered a return benefit. That was because he believed that PFM's providing that parsonage benefit to petitioners should be viewed as compensation to which Mr. Presley would be entitled in return for conducting various activities and performing other services for or on behalf of PFM.

After completing his research and analysis, Mr. Dryer advised petitioners (or their designee) that, in his opinion, they should be entitled to a charitable contribution deduction with respect to their transferring to PFM legal title to petitioners' residence while continuing to live in that residence as a parsonage. Mr. Dryer further informed petitioners that his advice as to the deductibility of the value of petitioners' residence as a charitable contribution was conditioned on petitioners'

[*45] compliance with the pertinent tax law and all the pertinent rules and regulations applicable to gifts to charity of substantial noncash contributions, including obtaining an appraisal of petitioners' residence because petitioners' residence had a value in excess of $5,000[39] and completing certain parts, and having completed by an appraiser and PFM (the donee charity) certain other respective parts, of Section B of Form 8283. In formulating his advice with respect to whether petitioners should be entitled to a charitable contribution deduction if they were to donate petitioners' residence to PFM and continue to live in it, Mr. Dryer reviewed the version of Form 8283 that was in effect for taxable year 2012 and gave petitioners some instructions about how to complete that form in order to comply with the various rules and regulations applicable to substantial noncash charitable contributions. Mr. Dryer further advised petitioners (or their designee) that if Mr. Presley were to stop conducting activities and performing other services for or on behalf of PFM and were to desire to continue living in petitioners' residence, they would be required to pay to PFM fair rental value for the right to do so.

Respondent assigned a revenue agent to examine petitioners' taxable years 2010 and 2012. The revenue agent, inter alia, proposed the initial determination

_____

[39]Mr. Dryer discussed the requirement that petitioners obtain an appraisal of petitioners' residence during the first discussion that he had with petitioners (or their designee) about their desire to donate that residence to PFM.

[*46] that petitioners are liable for each of their taxable years 2010 and 2012 for the accuracy-related penalty under section 6662(a). After the revenue agent in question made that initial determination under section 6662(a), she gave the manager of the group (group manager) in which she worked, who was her immediate supervisor, a document titled "Civil Penalty Approval Form" (penalty approval form), which she had completed as follows. The following statements appeared in a section of the penalty approval form titled "Reason(s) for Assertion of Penalty(s)": "The additional tax due for 2010 and 2012 is over $5,000 so the substantial understatement penalty does apply. TPs were negligent for not keeping proper documentation." The following pertinent portion of a preprinted statement appared on the penalty approval form immediately below those just-quoted statements: "Group Manager Approval to Assess Penalties Identified Above". On July 16, 2014, the group manager signed and dated July 16, 2014, the penalty approval form as completed by the revenue agent.

On July 7, 2016, respondent issued a notice of deficiency to petitioners for their taxable years 2010 and 2012 (notice).[40] In the notice, respondent determined

_____

[40]In certain filings by the parties that we ordered with respect to sec. 6751(b)(1) after this case was submitted, the parties agree that an Appeals Office of respondent issued the notice after the conclusion of that office's consideration of petitioners' position with respect to the proposed determinations of the revenue

(continued...)

[*47] for petitioners' taxable year 2010 to disallow the respective claimed charitable contribution deductions of $107,364 for the required land improvement expenses and $3,000 for the donated tractor/mower.[41]  In the notice, respondent further determined for petitioners' taxable year 2012 to disallow the claimed noncash charitable contribution deduction of $235,422 for petitioners' residence.[42]

In the notice, respondent also determined that petitioners are liable for each of their taxable years 2010 and 2012 for the accuracy-related penalty under section 6662(a).

---

[40](...continued)
agent for petitioners' taxable years 2010 and 2012, including the proposed determinations under sec. 6662(a).

[41]In the notice, respondent disallowed for their taxable year 2010 cash contributions totaling $112,574 but allowed additional noncash contributions of $2,022.  Consequently, the total adjustment in the notice for petitioners' taxable year 2010 with respect to charitable contribution deductions is $110,552 (disallowed claimed cash charitable contributions of $112,574) minus $2,022 (allowed additional cash charitable contributions).  Only $110,364 of that total adjustment is at issue.

[42]In the notice, respondent disallowed for petitioners' taxable year 2012 the claimed noncash charitable contribution of $235,422 for petitioners' residence but allowed other noncash charitable contributions of $19,204.  Respondent also allowed in the notice for petitioners' taxable year 2012 additional cash charitable contributions of $40,811.  Consequently, the total adjustment in the notice for petitioners' taxable year 2012 with respect to charitable contribution deductions is $175,407 (disallowed claimed noncash charitable contribution for petitioners' residence of $235,422) minus $19,204 (allowed other noncash charitable contributions) minus $40,811 (allowed additional cash charitable contributions).

**[*48]**                                    OPINION

Petitioners bear the burden of establishing that the determinations in the notice that remain at issue are erroneous.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Deductions are a matter of legislative grace, and petitioners bear the burden of proving entitlement to any deductions claimed.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  The Code and the regulations thereunder required petitioners to maintain records sufficient to establish the amounts of any deductions claimed.  See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Before considering the issues presented, we summarize our evaluation of the following witnesses who testified at the trial in this case:  Mr. Presley, Ms. Presley, Mr. Johnson, Ms. Burch, and Mr. Dryer.

We found the testimony of Mr. Presley to be inconsistent in certain material respects with certain testimony of certain other witnesses and with certain documentary evidence.  We also found Mr. Presley's testimony to be questionable in certain other material respects.

We found the testimony of Ms. Presley to be internally inconsistent at times and to be inconsistent at other times with Mr. Presley's testimony.

[*49] We found the testimony of Mr. Johnson to be internally inconsistent in certain material respects and to be inconsistent in certain material respects with certain testimony of certain other witnesses and with certain documentary evidence.

We found the testimony of Ms. Burch to be not credible in certain material respects.

We found the testimony of Mr. Dryer to be inconsistent in certain material respects with certain testimony of certain other witnesses and with certain documentary evidence.

We are not required to, and we will not, rely on the testimony of any witness whose testimony we question in order to establish petitioners' position with respect to each of the issues remaining for decision. See, e.g., Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Claimed Charitable Contribution Deductions

We must decide whether petitioners are entitled for their taxable year 2010 to deduct under section 170(a): (1) $107,364 for a claimed charitable contribution to PFM relating to certain required land improvement expenses that PFM Farms paid before 2010 and (2) $3,000 for a claimed charitable contribution of the tractor/mower in question. We must also decide whether petitioners are entitled for their taxable year 2012 to deduct under section 170(a) $235,422 for a claimed

**[\*50]** charitable contribution to PFM of petitioners' residence. Before addressing

those issues, we summarize briefly the relevant statutory and regulatory frame-

work within which we must resolve each of them.

Section 170(a) allows a deduction for any charitable contribution, as defined

in section 170(c), that is made during a taxable year. A taxpayer claiming a de-

duction under section 170(a) must satisfy certain statutory and regulatory require-

ments. See, e.g., sec. 170(a), (c), (f); secs. 1.170A-1, 1.170A-13(a) through (f),

Income Tax Regs. (We shall sometimes refer collectively to the requirements

under section 170 and the regulations thereunder that are pertinent here as the per-

tinent charitable contribution deduction requirements.) The pertinent charitable

contribution deduction requirements that a taxpayer must satisfy vary depending

on (1) whether the claimed contribution consists of money or property other than

money and (2) the claimed value of the contribution. See sec. 170(a), (c), (f); secs.

1.170A-1, 1.170A-13(a)-(c), Income Tax Regs.

<u>2010</u>

Claimed charitable contribution deduction
<u>relating to required land improvement expenses</u>

We consider whether petitioners are entitled for their taxable year 2010 to

deduct under section 170(a) $107,364 for a claimed charitable contribution to

[*51] PFM relating to the required land improvement expenses that PFM Farms paid before 2010. In stating that issue, we intentionally use the phrase "relating to" the required land improvement expenses. That is because it is unclear from our review of the record what petitioners are contending Mr. Presley contributed to PFM during 2010 relating to the required land improvement expenses for which they are claiming a deduction under section 170(a). In this regard, we note that certain testimonial evidence (e.g., the respective testimonies of Mr. Presley, Mr. Dryer, and Mr. Johnson) and certain documentary evidence (e.g., the October 20, 2010 minutes of PFM's board that Mr. Dryer drafted, Mr. Dryer's draft 2010 letter No. 1, PFM's draft letter No. 2, and PFM's draft letter No. 3) contain inconsistent (and sometimes internally inconsistent) statements about what Mr. Presley purportedly contributed to PFM during 2010 relating to the required land improvement expenses.

By way of illustration of certain inconsistent (and sometimes internally inconsistent) testimonial evidence, Mr. Presley testified that he informed Mr. Dryer and Mr. Johnson that in 2010 he donated to PFM his wholly owned limited liability company, PFM Farms. Certain testimony of Mr. Dryer[43] is inconsistent

---

[43]At all relevant times, including during 2010, Mr. Dryer, an attorney, represented the Presleys, Mr. Presley's optometry businesses, PFM, and/or PFM Farms.

[*52] with that testimony. Mr. Dryer testified that it was his understanding that in 2010 Mr. Presley contributed to PFM the ponds that PFM Farms had created on PFM's Tulsa property and that those ponds were to be used for swimming, fishing, canoeing, paddle boating, and other forms of enjoyment.[44]

Certain testimony of Mr. Johnson[45] regarding his understanding of what Mr. Presley contributed to PFM in 2010 relating to the required land improvement expenses also is inconsistent with Mr. Presley's testimony and is consistent with Mr. Dryer's testimony. Mr. Johnson testified that it was his understanding when he prepared petitioners' 2010 return that Mr. Presley had donated to PFM in 2010 the ponds that PFM Farms had created on PFM's Tulsa property and that those ponds were to be used for swimming, fishing, canoeing, paddle boating, and other forms of enjoyment.[46]

---

[44]Mr. Dryer's testimony, however, is inconsistent with the October 20, 2010 minutes that he prepared at the request of Mr. Presley and that described a proposed donation by Mr. Presley to PFM of "land and soil preparation in order to develop ministry land".

[45]Mr. Johnson prepared petitioners' 2010 return. When he prepared that return, Mr. Johnson was a C.P.A. and an employee of petitioners, Mr. Presleys' optometry businesses, and/or PFM Farms.

[46]When Mr. Johnson prepared petitioners' 2010 return, he was not aware that the reason PFM Farms created the ponds on PFM's Tulsa property was to provide irrigation to PFM Farms' blueberry farm, which it intended to operate on

(continued...)

[*53] However, certain other testimony of Mr. Johnson appears to be internally inconsistent with his testimony described above and also inconsistent with Mr. Dryer's testimony regarding what Mr. Presley contributed to PFM in 2010 relating to the required land improvement expenses. Mr. Johnson testified, and we have found, that he advised the Presleys that they should claim a charitable contribution deduction for the required land improvement expenses that PFM Farms paid before 2010.[47] Mr. Presley also testified, and we have also found, that he gave the Presleys that advice because, as he explained to them, they should have deducted those expenses for taxable years before their taxable year 2010 but did not do so because of errors in the preparation of their 2008 return and their 2009 return.

By way of illustration of certain inconsistent (and sometimes internally inconsistent) documentary evidence, the October 20, 2010 minutes of PFM's board stated in pertinent part: "The first order of business related to reviewing the proposed donation of * * * land and soil preparation in order to develop ministry

---

[46](...continued)
that property. When Mr. Johnson prepared petitioners' 2010 return, he was aware that PFM owned the property on which PFM Farms had created the ponds and that PFM Farms was leasing from PFM four to five acres of that property.

[47]When Mr. Johnson advised petitioners to deduct the required land improvement expenses in their 2010 return, he had not done any research regarding the propriety of a charitable contribution deduction for a taxpayer's expenses paid by the taxpayer before the year for which the deduction is claimed.

[*54] land for future needs in accord with its exempt purpose."[48] Mr. Dryer's draft 2010 letter No. 1 is inconsistent with the October 20, 2010 minutes in that that draft letter stated: "You donated the beautiful water ponds to the ministry enabling our youth and others to enjoy water sports, fishing, wildlife, and the beautiful setting. This provides a wonderful ministry setting and we thank you."[49] PFM's draft letter No. 2 and PFM's draft letter No. 3 are both consistent and inconsistent with the October 20, 2010 minutes and Mr. Dryer's draft 2010 letter No. 1. Those letters stated: "You donated the equipment and beautiful water ponds to the ministry enabling our youth and others to enjoy water sports, fishing, wildlife, and the beautiful setting. This provides a wonderful ministry setting and we thank you." However, those same two letters also stated inconsistently that Mr. Presley's donation to PFM was "Land/Pond Work".

On brief, petitioners further compound the problems created by certain testimonial and documentary evidence as to what Mr. Presley purportedly contributed to PFM in 2010 relating to the required land improvement expenses. Petitioners do so when they (1) contend a few times on brief that Mr. Presley

---

[48]However, see supra note 44 and accompanying text.

[49]However, see supra note 44 and accompanying text.

[*55] "made an outright gift [in 2010] of the land improvements to PFM"[50] and (2) also contend throughout their brief, inconsistently we believe, that they are entitled for their taxable year 2010 to deduct $107,364 of the required land improvement expenses under section 1.170A-1(g), Income Tax Regs.,[51] Van Dusen v. Commissioner, 136 T.C. 515 (2011), and Babilonia v. Commissioner, T.C. Memo. 1980-207, 1980 WL 4053, aff'd per curiam, 681 F.2d 678 (9th Cir. 1982).[52]

Despite the lack of clarity in the record as to what petitioners are claiming and what purportedly Mr. Presley contributed to PFM during 2010 relating to the required land improvement expenses, as well as regarding what their representa-

---

[50]However, as discussed below, petitioners inconsistently concede on brief that PFM, not PFM Farms, owned the property on which PFM Farms created the ponds. Moreover, petitioners acknowledge on brief that "petitioners did not own the improvements made to the [PFM] land or any of the existing ponds" that PFM Farms created.

[51]Sec. 1.170A-1(g), Income Tax Regs., provides in pertinent part that "unreimbursed expenditures made incident to the rendition of services to an organization contributions to which are deductible may constitute a deductible contribution."

[52]Petitioners acknowledge on brief that there are other pertinent charitable contribution deduction requirements with respect to substantiation (charitable contribution deduction substantiation requirements) that apply, inter alia, to petitioners' claimed deduction under sec. 170(a) relating to the required land improvement expenses.

[*56] tives, Mr. Dryer and Mr. Johnson, understood Mr. Presley contributed to PFM in 2010 relating to those expenses, we now address whether petitioners are entitled for their taxable year 2010 to deduct under section 170(a) $107,364 for a claimed charitable contribution relating to the required land improvement expenses.

We address first whether petitioners are entitled for their taxable year 2010 to a charitable contribution deduction for $107,364 because, as petitioners contend a few times on brief and Mr. Dryer and Mr. Johnson testified at trial, Mr. Presley contributed to PFM in 2010 the ponds that PFM Farms created on PFM's Tulsa property. Petitioners concede that PFM, not petitioners through PFM Farms, owned PFM's Tulsa property on which PFM Farms created the ponds. Petitioners also concede on brief that "petitioners did not own the improvements made to the [PFM] land or any of the existing ponds" that PFM Farms created. Petitioners through PFM Farms could not have contributed to PFM in 2010 or any other year the ponds which PFM Farms created on PFM's Tulsa property and which they concede they did not own through PFM Farms.

On the record, before us, we find that petitioners have failed to carry their burden of establishing that in 2010 Mr. Presley contributed to PFM the ponds that

**[*57]** PFM Farms created on PFM's Tulsa property.[53]  On that record, we find that petitioners have failed to carry their burden of establishing that they are entitled for their taxable year 2010 to a charitable contribution deduction of $107,364 for the ponds that PFM Farms created on PFM's Tulsa property.

We turn next to whether petitioners are entitled for their taxable year 2010 to deduct under section 170(a) $107,364 of the required land improvement expenses that PFM Farms paid before 2010.  As discussed above, section 170(a) allows a deduction for any charitable contribution, as defined in section 170(c), that is made during a taxable year.  See sec. 1.170A-1(a), Income Tax Regs.[54] Petitioners acknowledge that PFM Farms paid the required land improvement expenses before 2010.  On the record before us, we find that petitioners have failed to carry their burden of establishing that they are entitled for their taxable

_____

[53]Even if we had not found that petitioners failed to carry their burden of establishing that in 2010 Mr. Presley contributed to PFM the ponds that PFM Farms created on PFM's Tulsa property, we would nonetheless find that petitioners have failed to carry their burden of establishing that they satisfy all of the charitable contribution deduction substantiation requirements that apply to that claimed charitable contribution.

[54]Sec. 1.170A-1(a), Income Tax Regs., provides in pertinent part:  "Any charitable contribution, as defined in section 170(c), actually paid during the taxable year is allowable as a deduction in computing taxable income irrespective of the method of accounting employed or of the date on which the contribution is pledged."

[*58] year 2010 to deduct under section 170(a) $107,364 of the required land improvement expenses that PFM Farms paid before 2010.

Even if PFM Farms had paid the required land improvement expenses in 2010, we would find on the record before us that petitioners have failed to carry their burden of establishing that they satisfy section 1.170A-1(g), Income Tax Regs. Pursuant to that regulation, in order for the required land improvement expenses to be deductible under section 170(a), PFM Farms must have incurred them "incident to the rendition of services to" PFM. We have held that in order to be deductible under section 170(a) and section 1.170A-1(g), Income Tax Regs., "unreimbursed expenses must be directly connected with and solely attributable to the rendition of services to a charitable organization." Van Dusen v. Commissioner, 136 T.C. at 525 (citing Saltzman v. Commissioner, 54 T.C. 722, 724 (1970)). PFM Farms paid the required land improvement expenses for the purpose of, inter alia, creating the ponds on PFM's Tulsa property in order to have an irrigation source for PFM Farms' blueberry farm, which PFM Farms intended to operate for profit on the leased PFM property. On the record before us, even if PFM Farms had paid the required land improvement expenses in 2010, we would find that petitioners have failed to carry their burden of establishing that the required land

[*59] improvement expenses that PFM Farms paid were directly connected with or solely attributable to the rendition of services to PFM by PFM Farms.

Even if PFM Farms had paid the required land improvement expenses in 2010 and those expenses were directly connected with and solely attributable to the rendition of services to PFM by PFM Farms, we would find on the record before us that petitioners have failed to carry their burden of establishing that they satisfy the substantiation requirements in section 170(f)(8)(A) and (C) and section 1.170A-13(f)(1) and (3), Income Tax Regs. Those authorities, which apply to contributions of $250 or more, required petitioners to substantiate the claimed contribution relating to the required land improvement expenses with a contemporaneous written acknowledgement from PFM. See Van Dusen v. Commissioner, 136 T.C. at 536. In order for the acknowledgement to be considered contemporaneous, the taxpayer must obtain it before the earlier of (1) the date on which the taxpayer files the return claiming the deduction or (2) the due date, including extensions, within which the taxpayer must file the return claiming the deduction. See sec. 170(f)(8)(C); sec. 1.170A-13(f)(3), Income Tax Regs.; see also Van Dusen v. Commissioner, 136 T.C. at 536-537.

The record contains the following three different purported acknowledgement letters from PFM that were addressed to PFM Farms: Mr. Dryer's draft 2010

[*60] letter No. 1, PFM's draft letter No. 2, and PFM's draft letter No. 3. None of those letters is dated. Although the copy of each of those letters that is in the record is signed by Mr. Douglas,[55] petitioners have failed to carry their burden of establishing that Mr. Douglas in fact signed Mr. Dryer's draft 2010 letter No. 1, PFM's draft letter No. 2, and/or PFM's draft letter No. 3. Even if the record had established that Mr. Douglas signed one or more of those letters, petitioners have failed to carry their burden of establishing when he signed any of them and sent any of them to PFM Farms, Mr. Presley, and/or petitioners. On the record before us, even if PFM Farms had paid the required land improvement expenses in 2010 and those expenses were directly connected with and solely attributable to the rendition of services to PFM by PFM Farms, we would find that petitioners have failed to carry their burden of establishing that they satisfy the substantiation requirements in section 170(f)(8)(A) and (C) and section 1.170A-13(f)(1) and (3), Income Tax Regs.

Even if PFM Farms had paid the required land improvement expenses in 2010, those expenses were directly connected with and solely attributable to the rendition of services to PFM, and Mr. Dryer's draft 2010 letter No. 1, PFM's draft

---

[55]Mr. Douglas was an employee of petitioners, Mr. Presley's optometry businesses, and/or PFM Farms. Petitioners did not call Mr. Douglas as a witness.

[*61] letter No. 2, and/or PFM's draft letter No. 3 had been signed by Mr. Douglas and had been sent to PFM within the time prescribed in section 170(f)(8)(C) and section 1.170A-13(f)(3), Income Tax Regs., we would find on the record before us that petitioners have failed to carry their burden of establishing that they satisfy the substantiation requirements in section 170(f)(8)(B)(ii) and (iii) and section 1.170A-13(f)(2)(ii) and (iii), Income Tax Regs. Section 1.170A-13(f)(2)(ii), Income Tax Regs., which was promulgated under section 170(f)(8)(B)(ii), requires a donee organization to indicate in a contemporaneous written acknowledgement "whether or not the donee organization provides any goods or services in consideration, in whole or part, for any of the cash or other property transferred to the donee organization." Where the donee organization provides any goods or services, section 170(f)(8)(B)(iii) and section 1.170A-13(f)(2)(iii), Income Tax Regs., require the donee organization to indicate in the contemporaneous written acknowledgement "a description and good faith estimate of the value of those goods or services". Where the acknowledgement incorrectly states that "[n]o goods or services were provided for the donation", that donor acknowledgement fails to satisfy the substantiation requirements in section 170(f)(8)(B)(ii) and (iii) and section 1.170A-13(f)(2)(ii) and (iii), Income Tax Regs. See Viralam v. Commissioner, 136 T.C. 151, 171 (2011). The following language appeared in each of the

[*62] purported acknowledgement letters (i.e., Mr. Dryer's draft 2010 letter No. 1, PFM's draft letter No. 2, and PFM's draft letter No. 3): "No goods or services were provided for the contributions given." We have found that PFM Farms paid the required land improvement expenses, inter alia, to create the ponds on an area of PFM's Tulsa property other than the leased PFM property as a source of irrigation for PFM Farms' blueberry farm, which PFM Farms intended to operate for profit on that leased property.[56] On the record before us, we find that PFM Farms expected to benefit financially from the required land improvement expenses that it paid by establishing and operating PFM Farms' blueberry farm with the intention of making a profit.[57] On that record, even if PFM Farms had paid the required land improvement expenses in 2010, those expenses were directly connected with and solely attributable to the rendition of service to PFM, and Mr. Dryer's draft 2010 letter No. 1, PFM's draft letter No. 2, and/or PFM's draft letter No. 3 had

---

[56]We also note that petitioners have failed to establish that the $1,000 annual rent that PFM Farms agreed to pay to PFM under the PFM Farms' lease represented the annual fair rental value for the four to five acres of PFM's Tulsa property that PFM Farms leased from PFM under that lease.

[57]According to petitioners, Mr. Presley intended to contribute to PFM any profit that PFM Farms received from operating the PFM Farms' blueberry farm. Even if he did so intend, that intention is immaterial to our finding that PFM Farms expected to make a profit and thereby benefit financially from the required land improvement expenses that it paid.

[*63] been signed by Mr. Douglas and had been sent to PFM within the time prescribed by section 170(f)(8)(C) and section 1.170A-13(f)(3), Income Tax Regs., we would find that petitioners have failed to carry their burden of establishing that they satisfy the substantiation requirements in section 170(f)(8)(B)(ii) and (iii) and section 1.170A-13(f)(2)(ii) and (iii), Income Tax Regs.[58]

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they are entitled for their taxable year 2010 to deduct under section 170(a) $107,364 of the required land improvement expenses that PFM Farms paid before 2010.

### Claimed charitable contribution deduction for the tractor/mower in question

We consider next whether petitioners are entitled for their taxable year 2010 to deduct under section 170(a)(1) $3,000 for a claimed charitable contribution to PFM of the tractor/mower in question. It is respondent's position that petitioners are not entitled to do so because they did not comply with certain charitable con-

---

[58]We would also find that petitioners have failed to carry their burden of establishing that they satisfy the substantiation requirements in sec. 1.170A-13(f)(10), Income Tax Regs., which prescribes an alternative way for a taxpayer to substantiate unreimbursed expenditures incident to the rendition of services to a charitable organization within the meaning of sec. 1.170A-1(g), Income Tax Regs. (discussed above).

[*64] tribution deduction substantiation requirements that apply to petitioners'
claimed $3,000 deduction for the tractor/mower in question.

Petitioners concede on brief that they

failed to properly substantiate the donation of the Toro Tractor [the tractor/mower in question] as they did not include any of the required information on Form 8283 in their 2010 tax return showing: (1) a description of the donated property; (2) the approximate date the mower was acquired and the manner of its acquisition; (3) the cost or other basis of the mower; (4) the fair market value of the mower at the time it was contributed; and (5) the method used in determining its fair market value. See I.R.C. § 170(f)(11)(B); Treas. Reg. §§ 1.170A-13(b)(ii)(C) [sic] and (D), (3)(i)(A) and (B).

Although they concede that they do not satisfy certain charitable contribu-
tion deduction substantiation requirements that apply to their claimed $3,000
deduction for the tractor/mower in question, petitioners take the position that they
nonetheless are entitled to that claimed deduction. That is because, according to
petitioners, their "failure to meet those requirements is due to 'reasonable cause
and not to willful neglect.'" As support for their position, petitioners rely on
section 170(f)(11)(A)(ii)(II). That section provides that section 170(f)(11)(A)(i)[59]

---

[59]As pertinent here, sec. 170(f)(11)(A)(i) provides that no deduction under
sec. 170(a) will be allowed "for any contribution of property for which a deduction
of more than $500 is claimed unless * * * [the taxpayer] meets the requirements
of" sec. 170(f)(11)(B).

**[\*65]** "shall not apply if it is shown that the failure to meet such requirements [in section 170(f)(11)(A)(i)] is due to reasonable cause and not to willful neglect."

In support of their position under section 170(f)(11)(A)(ii)(II), petitioners contend as follows:

> Petitioners relied upon their competent tax adviser (Robert Johnson, C.P.A.) to prepare the [2010] Form 8283 with respect to the donation of the Toro Tractor mower.  Mr. Johnson testified that he had unfettered access to Petitioners' records and was provided with the make, model, and year of the mower as well as a soft copy of the invoice showing the original purchase, but simply failed to include the information on their [2010] Form 8283.  Petitioners had no reason to doubt Mr. Johnson's competence and believed that the mower had been correctly reported on their 2010 tax return.

Neither section 170(f)(11)(A)(ii)(II) nor the regulations thereunder provide a definition of, or any helpful guidance with respect to, the term "reasonable cause" which those authorities use.[60]  However, the term "reasonable cause" also is used in certain Code provisions imposing additions to tax and penalties.[61]  See, e.g., secs. 6651, 6652, 6664(c).  Consequently, as we did in Crimi v. Commissioner, T.C. Memo. 2013-51, at \*99, we look for guidance as to the meaning of the

---

[60]Nor do sec. 170(f)(11)(A)(ii)(II) and the regulations thereunder provide us with a definition of, or any helpful guidance with respect to, the term "willful neglect" that those authorities use.

[61]The term "willful neglect" also is used in certain provisions of the Code relating to the imposition of additions to tax and penalties.  See, e.g., secs. 6651(a)(1) and (2), 6652(a).

[*66] term "reasonable cause" in section 170(f)(11)(A)(ii)(II) to caselaw that has considered the same term in the context of issues presented under those other provisions.

We note initially that reasonable cause requires a taxpayer to exercise ordinary business care and prudence. See, e.g., United States v. Boyle, 469 U.S. 241, 246 (1985); McNair Eye Ctr., Inc. v. Commissioner, T.C. Memo. 2010-81, 2010 WL 1558164, at *3. Moreover, the inquiry into whether reasonable cause is present is a fact-intensive inquiry that requires a case-by-case examination of all the facts and circumstances presented in each case. See, e.g., Crimi v. Commissioner, at *99.

Where, as here, a taxpayer claims to have relied on the advice of a professional, such as a C.P.A. or an attorney, the taxpayer has the burden of establishing the following facts in order for us to sustain that claim: (1) the taxpayer reasonably believed that the professional was a competent tax adviser with sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the professional who gave advice to the taxpayer; and (3) the taxpayer relied in good faith on that advice. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); Crimi v. Commissioner, at *99.

**[\*67]** We decide only the question of whether petitioners relied in good faith on Mr. Johnson when he presented them for their review the 2010 return which he had prepared and in which there was a claimed charitable contribution deduction of $3,000 for the tractor/mower in question.[62]  That is because our resolution of that question resolves the issue under section 170(f)(11)(A)(ii)(II) of whether petitioners' failure to meet the requirements in section 170(f)(11)(A)(i) that apply to their claimed charitable contribution deduction of $3,000 for the tractor/mower in question is due to reasonable cause and not to willful neglect.

Although Mr. Johnson prepared petitioners' 2010 return, Mr. Dryer also gave advice to petitioners with respect to certain appraisal and return reporting requirements that applied to their proposed donation to PFM of the tractor/mower in question (and their proposed donation to PFM of the "land and soil preparation"). He did so when he included the Form 8283 appraisal requirement language and the Form 8283 donor acknowledgement requirement language as part of the resolution set forth in the October 20, 2010 minutes of PFM's board, which he had prepared at the request of Mr. Presley and which addressed the proposed donation to PFM of "a tractor and land and soil preparation".  Mr. Dryer included that language because he wanted it to serve as an important reminder to obtain an apprais-

---

[62]See supra note 32.

[*68] al of any substantial noncash property donated to PFM and to include a properly completed and executed Form 8283 with petitioners' 2010 return because of those proposed donations.

Petitioners do not address on brief Mr. Dryer's advice to obtain an appraisal of any substantial noncash property donated to PFM and to include a properly completed and executed Form 8283 with petitioners' 2010 return. We believe that they do not do so because they did not follow that advice. Although the 2010 return that Mr. Johnson had prepared for petitioners included their 2010 Form 8283,[63] that form was incomplete and thus not properly completed. Petitioners' 2010 Form 8283 did not make any reference in Section A relating to donated property of $5,000 or less (and certain publicly traded securities) to a claimed deduction of the tractor/mower in question or any other similar equipment.[64] A review of the 2010 return that Mr. Johnson had prepared for petitioners, in par-

[63]Form 8283 instructed and required each taxpayer who claimed a total deduction of over $500 for all donated noncash property to attach that form to the taxpayer's tax return. In their 2010 Schedule A, petitioners claimed charitable contributions totaling $337,114. Of that total amount of claimed charitable contribution deductions, petitioners indicated in their 2010 Schedule A that $4,145 represented gifts "[o]ther than cash or check".

[64]Nor did any other form, schedule, or attachment to the 2010 return that Mr. Johnson had prepared make any reference to or contain any information regarding a claimed charitable contribution deduction for a tractor/mower or any other equipment.

[*69] ticular a review of petitioners' 2010 Form 8283 that he had prepared, would have caused a reasonable person, especially in the light of Mr. Dryer's advice, to ask Mr. Johnson why he did not include in that form any reference to or any information regarding a claimed deduction for their donation of the tractor/mower in question. The record does not establish that petitioners made any such inquiry of Mr. Johnson, presumably because they did not.

On the record before us, we find that petitioners have failed to carry their burden of establishing that they exercised ordinary business care and prudence or otherwise did what a reasonable person would do under the facts and circumstances. On that record, we find that petitioners have failed to carry their burden of establishing that they relied in good faith on Mr. Johnson when he presented them for their review the 2010 return that he had prepared and that included nowhere in their 2010 Form 8283 or in any other form, schedule, or attachment to that return any reference to or any information regarding a claimed charitable contribution deduction for the tractor/mower in question. On the record before us, we find that petitioners have failed to carry their burden of establishing that their failure to satisfy certain charitable contribution deduction substantiation requirements that apply to their claimed charitable contribution deduction of $3,000 for the

[*70] tractor/mower in question is due to reasonable cause and not to willful neglect within the meaning of section 170(f)(11)(A)(ii)(II).

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they are entitled for their taxable year 2010 to deduct under section 170(a) $3,000 for the tractor/ mower in question.

### 2012

We address whether petitioners are entitled for their taxable year 2012 to deduct under section 170(a) $235,422 for a claimed charitable contribution to PFM of petitioners' residence. It is respondent's position that petitioners are not entitled to do so. In support of respondent's position, respondent argues that (1) petitioners retained dominion and control over petitioners' residence after they purportedly contributed it to PFM; (2) when they made the purported contribution to PFM of petitioners' residence, petitioners expected to, and did, receive a sub- stantial benefit in return because PFM allowed them to reside in that residence without paying any rent to it; and (3) petitioners failed to comply or substantially comply with certain charitable contribution deduction substantiation requirements that apply to the claimed charitable contribution of petitioners' residence.

[*71] Petitioners disagree with each of respondent's three arguments. In addition, petitioners maintain that even if we were to find that petitioners did not comply or substantially comply with all of the applicable charitable contribution deduction substantiation requirements, their failure to meet those requirements is due to reasonable cause. Petitioners maintain that consequently, pursuant to section 170(f)(11)(A)(ii)(II), section 170(f)(11)(A)(i) does not disallow their claimed charitable contribution deduction of $235,422 for petitioners' residence.

We address only respondent's third argument set forth above. That is because our findings as to whether petitioners complied or substantially complied with certain charitable contribution deduction substantiation requirements that apply to their claimed charitable contribution deduction of $235,422 for petitioners' residence resolves the question of whether section 170(f)(11)(A)(i) disallows that claimed deduction.[65]

We turn now to respondent's third argument that petitioners did not comply or substantially comply with certain charitable contribution deduction substantia-

---

[65]Sec. 170(f)(11)(A)(i) would not disallow petitioners' claimed charitable contribution deduction of $235,422 for petitioners' residence if we were to sustain petitioners' alternative argument under sec. 170(f)(11)(A)(ii)(II) that their failure to meet those requirements is due to reasonable cause.

**[*72]** tion requirements that apply to the claimed charitable contribution of peti-

tioners' residence to PFM. Section 170(f)(11)(C) provides in pertinent part:

> Qualified appraisal for contributions of more than $5,000.--In the case of contributions of property for which a deduction of more than $5,000 is claimed, the requirements of this subparagraph are met if the individual * * * obtains a qualified appraisal of such property and attaches to the return for the taxable year in which such contribution is made such information regarding such property and such appraisal as the Secretary may require.

The regulations that the Secretary promulgated under section 170(f)(11)(C)

provide in pertinent part:

> (2) Substantiation requirements.--(i) In general.--* * * [a] donor who claims or reports a deduction with respect to a charitable contribution to which this paragraph (c) [relating to claimed charitable deductions in excess of $5,000] applies must comply with the following three requirements:
>
> (A) Obtain a qualified appraisal (as defined in paragraph (c)(3) of this section) for such property contributed. * * *
>
> (B) Attach a fully completed appraisal summary (as defined in paragraph (c)(4) of this section) to the tax return * * * on which the deduction for the contribution is first claimed (or reported) by the donor.

Sec. 1.170A-13(c)(2)(i), Income Tax Regs.

We address first whether, as required by section 170(f)(11)(C) and section

1.170A-13(c)(2)(i), Income Tax Regs., petitioners obtained a qualified appraisal.

**[*73]** Section 170(f)(11)(E) defines the term "qualified appraisal" and the term

"qualified appraiser" that is used in that definition, as follows:

Qualified appraisal and appraiser.--For purposes of this paragraph--

(i) Qualified appraisal.--The term "qualified appraisal" means, with respect to any property, an appraisal of such property which--

(I) is treated for purposes of this paragraph as a qualified appraisal under regulations or other guidance prescribed by the Secretary, and

(II) is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed under subclause (I).

(ii) Qualified Appraiser.--Except as provided in clause (iii), the term "qualified appraiser" means an individual who--

(I) has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum education and experience requirements set forth in regulations prescribed by the Secretary,

(II) regularly performs appraisals for which the individual receives compensation, and

(III) meets such other requirements as may be prescribed by the Secretary in regulations or other guidance.

**[\*74]** The regulations that the Secretary promulgated under section 170(f)(11)(E)

provide in pertinent part:

> (3) Qualified appraisal.--(i) In general.--For purposes of this paragraph (c), the term "qualified appraisal" means an appraisal document that--
>> (A) Relates to an appraisal that is made not earlier than 60 days prior to the date of contribution of the appraised property nor later than the date specified in paragraph (c)(3)(iv)(B) of this section;
>> (B) Is prepared, signed, and dated by a qualified appraiser (within the meaning of paragraph (c)(5) of this section);
>> (C) Includes the information required by paragraph (c)(3)(ii) of this section; * * *

> \*          \*          \*          \*          \*          \*          \*

>> (ii) Information included in qualified appraisal.--A qualified appraisal shall include the following information:
>> (A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;
>> (B) In the case of tangible property, the physical condition of the property;
>> (C) The date (or expected date) of contribution to the donee;
>> (D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed, including, for example, the terms of any agreement or understanding that--
>>> (1) Restricts temporarily or permanently a donee's right to use or dispose of the donated property,
>>> (2) Reserves to, or confers upon, anyone (other than a donee organization or an organization participating with a

**[*75]** donee organization in cooperative fund-raising) any right * * * to the possession of the property * * *, or

(<u>3</u>) Earmarks donated property for a particular use;

\* \* \* \* \* \* \*

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G) A statement that the appraisal was prepared for income tax purposes;

(H) The date (or dates) on which the property was appraised;

\* \* \* \* \* \* \*

(iv) Special rules.-- * * *

(B) Time of receipt of qualified appraisal.--The qualified appraisal must be received by the donor before the due date (including extensions) of the return on which a deduction is first claimed * * * under section 170 with respect to the donated property * * *

Sec. 1.170A-13(c)(3)(i)(A), (B), and (C), (ii), (iv)(B), Income Tax Regs.

It is petitioners' position that the appraisal report that Mr. Scott prepared in which he valued petitioners' residence is a qualified appraisal within the meaning of section 170(f)(11)(E) because "it fully satisfies the requirements set forth in Treas. Reg. § § 1.170A-13(c)(3)(i) and (ii)". In advancing that position, petition-

**[*76]** ers examine some, but not all, of those requirements and explain why they believe that they are satisfied.[66]

We address below each of the requirements in section 1.170A-13(c)(3)(i) and (ii), Income Tax Regs., which we find Mr. Scott's December 5, 2013 appraisal report does not satisfy.[67]

Petitioners assert that the appraisal report that Mr. Scott prepared in which he valued petitioners' residence satisfies the requirement in sec. 1.170A-13(c)(3)(i)(A), Income Tax Regs. In support of that assertion, petitioners state:

> Ronald Scott [the appraiser] visited the [petitioners'] Residence on May 10, 2012 (only 12 days after the Residence was contributed and prior to the [petitioners' 2012] tax return being filed on October 15, 2013, well within the timeframe set forth in Treas. Reg. § 1.170A-13(c)(3)(i)(A). As such, the appraisal was conducted [by Mr.

---

[66]As discussed below, petitioners completely ignore certain requirements in sec. 1.170A-13(c)(3)(ii), Income Tax Regs. They also totally ignore the requirement in sec. 1.170A-13(c)(3)(iv)(B), Income Tax Regs. Pursuant to that regulation, petitioners were required to receive the qualified appraisal of petitioners' residence before October 15, 2013, which was the due date, including extensions, for the filing of petitioners' 2012 return.

[67]We address only each of the requirements in sec. 1.170A-13(c)(3)(i) and (ii), Income Tax Regs., which we find Mr. Scott's December 5, 2013 appraisal report does not satisfy. However, the failure to satisfy any one of those requirements, or any of the other charitable contribution deduction substantiation requirements, may be sufficient to deny petitioners their claimed charitable contribution deduction for petitioners' residence unless we were to sustain petitioners' alternative argument under sec. 170(f)(11)(A)(ii)(II) that their failure to meet those requirements is due to reasonable cause.

[*77] Scott] within the stated safe harbor period * * * . The appraisal report being prepared and signed on December 9 [sic], 2013 does not change the fact that the effective date of appraisal was May 10, 2012.

As we understand petitioners' position, it is the valuation date, i.e., the date as of which the property is valued, to which section 1.170A-13(c)(3)(i)(A), Income Tax Regs., is referring in requiring that the appraisal document "[r]elate[] to an appraisal that is made not earlier than 60 days prior to the date of contribution * * * nor later than the date specified in paragraph (c)(3)(iv)(B) of this section [1.170A-13] (c)".  We reject petitioners' bizarre reading of section 1.170A-13(c)(3)(i)(A), Income Tax Regs.  An appraisal is made when an appraisal document is final and is signed and dated by the appraiser.  It is not made on the date as of which the appraiser is determining the fair market value of the property that he is asked to appraise.  On December 5, 2013, Mr. Scott signed the appraisal report in which he appraised the fair market value of petitioners' residence as of May 10, 2012.  In Mr. Scott's December 5, 2013 appraisal report, Mr. Scott indicated that the date of that report was December 5, 2013, the same date on which he signed it.

On the record before us, we find that Mr. Scott's December 5, 2013 appraisal report was made on December 5, 2013.  The due date, including extensions, for the filing of petitioners' 2012 return was October 15, 2013.  On the record before us, we find that Mr. Scott's December 5, 2013 appraisal report did not "relate[] to

[*78] an appraisal that is made not earlier than 60 days prior to the date of contribution of * * * [petitioners' residence] nor later than [October 15, 2013] the date specified in" section 1.170A-13(c)(3)(iv)(B), Income Tax Regs.  On the record before us, we find that the requirement in section 1.170A-13(c)(3)(i)(A), Income Tax Regs., is not satisfied.

In order to constitute a qualified appraisal, Mr. Scott's December 5, 2013 appraisal report also was required to "include[] the information required by paragraph (c)(3)(ii) [of section 1.170A-13]".[68]  Petitioners completely ignore the requirement in section 1.170A-13(c)(3)(ii)(C), Income Tax Regs. (quoted above), that a qualified appraisal include "the date * * * of contribution to the donee".  Mr. Scott's December 5, 2013 appraisal report contained no information with respect to petitioners' transfer to PFM on April 30, 2012, of legal title to petitioners' residence.[69]  On the record before us, we find that the requirement in section 1.170A-13(c)(3)(ii)(C), Income Tax Regs., is not satisfied.

Petitioners also completely ignore the requirement in section 1.170A-13(c)(3)(ii)(D), Income Tax Regs. (quoted above), that a qualified appraisal in-

---

[68]See supra note 66.

[69]In fact, we have serious reservations as to whether Mr. Scott even knew about petitioners' transfer to PFM on April 30, 2012, of legal title to petitioners' residence.

[*79] clude "[t]he terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use * * * of the property contributed". From the time they transferred legal title to petitioners' residence to PFM until at least December 5, 2013,[70] the date of Mr. Scott's December 5, 2013 appraisal report, petitioners continued to live in petitioners' residence and to pay all utility bills and did not pay any rent to PFM for the right to live in that residence. Nonetheless, Mr. Scott's December 5, 2013 appraisal report contained no information with respect to that arrangement. On the record before us, we find that the requirement in section 1.170A-13(c)(3)(ii)(D), Income Tax Regs., is not satisfied.

Petitioners assert that Mr. Scott's December 5, 2013 appraisal report satisfies the requirement in section 1.170A-13(c)(3)(ii)(G), Income Tax Regs. (quoted above), that the qualified appraisal contain "[a] statement that the appraisal was prepared for income tax purposes". In support of that assertion, petitioners state: "The appraisal included a statement that its purpose was to develop an opinion of the market value of the property as of May 10, 2012. This demonstrates that the appraisal was prepared for income tax purposes." Petitioners' conclusion that the

---

[70]Petitioners were still living in petitioners' residence as of the time of the trial in this case.

[*80] statement in Mr. Scott's December 5, 2013 appraisal report that "its purpose * * * to develop an opinion of the market value of the property as of May 10, 2012 * * * demonstrates that the appraisal was prepared for income tax purposes" is a non sequitur. Moreover, not only did Mr. Scott's December 5, 2013 appraisal report not contain a statement, or any wording that could be read to indicate, that Mr. Scott prepared that report for income tax purposes, that report expressly stated the purpose for which it was prepared was a "mortgage finance transaction". Mr. Scott's December 5, 2013 appraisal report stated in pertinent part:

> THE INTENDED USER OF THIS APPRAISAL IS THE LENDER/ CLIENT. THE INTENDED USE IS TO EVALUATE THE PROPERTY THAT IS THE SUBJECT OF THIS APPRAISAL FOR A MORTGAGE FINANCE TRANSACTION, SUBJECT TO THE STATED SCOPE OF WORK, PURPOSE OF THE APPRAISAL, REPORTING REQUIREMENTS OF THIS APPRAISAL REPORT FORM AND DEFINITION OF MARKET VALUE, NO ADDITIONAL INTENDED USERS ARE IDENTIFIED BY THE APPRAISER.

> *    *    *    *    *    *    *

> **INTENDED USE**: The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

> **INTENDED USER**: The intended user of this appraisal report is the lender/client.

[*81] Mr. Scott's December 5, 2013 appraisal report identified both the "Borrower" and the "Lender/Client" as PFM. On the record before us, we find that the requirement in section 1.170A-13(c)(3)(ii)(G), Income Tax Regs., is not satisfied.

On the record before us, we find that petitioners did not, as required by section 170(f)(11)(C) and the regulations thereunder (quoted above), obtain a qualified appraisal, as defined in section 170(f)(11)(E) and section 1.170A-13(c)(3)(i) and (ii), Income Tax Regs.

We consider next whether the requirement in section 1.170A-13(c)(3)(iv)(B), Income Tax Regs., is satisfied. Petitioners completely ignore the requirement in that regulation that they were required to receive a qualified appraisal of petitioners' residence before October 15, 2013, which was the due date, including extensions, for the filing of their 2012 return. On the record before us, we find that petitioners did not, as required by section 1.170A-13(c)(3)(iv)(B), Income Tax Regs., receive Mr. Scott's December 5, 2013 appraisal report before October 15, 2013, the due date, including extensions, for the filing of their 2012

[*82] return.[71]  On the record before us, we find that the requirement in section

1.170A-13(c)(3)(iv)(B), Income Tax Regs., is not satisfied.

We address now whether, as required by section 1.170A-13(c)(2)(i)(B),

Income Tax Regs., petitioners attached to their 2012 return a fully completed

appraisal summary, as defined in section 1.170A-13(c)(4), Income Tax Regs.

The latter regulation defines the term "appraisal summary" in pertinent part as

> a summary of a qualified appraisal that--
> (A) Is made on the form prescribed by the Internal Revenue Service;
> (B) Is signed and dated (as described in paragraph (c)(4)(iii) of this section) by the donee (or presented to the donee for signature in cases described in paragraph (c)(4)(iv)(C)(2) of this section);
> (C) Is signed and dated by the qualified appraiser (within the meaning of paragraph (c)(5) of this section) who prepared the qualified appraisal (within the meaning of paragraph (c)(3) of this section); and
> (D) Includes the information required by paragraph (c)(4)(ii) of this section.

> \*       \*       \*       \*       \*       \*       \*

> (ii) Information included in an appraisal summary.--An appraisal summary shall include the following information:

> \*       \*       \*       \*       \*       \*       \*

---

[71]We did not find credible Ms. Burch's testimony that, inter alia, petitioners gave her an appraisal of petitioners' residence before she prepared petitioners' 2012 return.  Mr. Presley testified that he did not remember when Mr. Scott's December 5, 2013 appraisal report was made.

**[*83]**    (I) The name, address, and (if a taxpayer identification number is otherwise required by section 6109 and the regulations thereunder) the identifying number of the qualified appraiser who signs the appraisal summary and of other persons as required by paragraph (c)(3)(ii)(E) of this section;

\*         \*         \*         \*         \*         \*         \*

(K) The declaration by the appraiser described in paragraph (c)(5)(i) of this section;

(L) A declaration by the appraiser stating that--

(1) The fee charged for the appraisal is not of a type prohibited by paragraph (c)(6) of this section; and

(2) Appraisals prepared by the appraiser are not being disregarded pursuant to 31 U.S.C. §330(c) on the date the appraisal summary is signed by the appraiser; and

(M) Such other information as may be specified by the form.

(iii) Signature of the original donee.--The person who signs the appraisal summary for the donee shall be an official authorized to sign the tax or information returns of the donee, or a person specifically authorized to sign appraisal summaries by an official authorized to sign the tax or information returns of such donee.  \* \* \* The signature of the donee on the appraisal summary does not represent concurrence in the appraised value of the contributed property.  Rather, it represents acknowledgement of receipt of the property described in the appraisal summary on the date specified in the appraisal summary \* \* \*

\*         \*         \*         \*         \*         \*         \*

(iv) Special rules.-- \* \* \*

\*         \*         \*         \*         \*         \*         \*

(E) Statement to be furnished by donors to donees.--Every donor who presents an appraisal summary to a donee for signature after June 6, 1988, in order to comply with paragraph (c)(4)(i)(B) of

[*84] this section shall furnish a copy of the appraisal summary to such donee.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(H) Failure to attach appraisal summary.--In the event that a donor fails to attach to the donor's return an appraisal summary as required by paragraph (c)(2)(i)(B) of this section, the Internal Revenue Service may request that the donor submit the appraisal summary within 90 days of the request.  If such a request is made and the donor complies with the request within the 90-day period, the deduction under section 170 shall not be disallowed for failure to attach the appraisal summary, provided that the donor's failure to attach the appraisal summary was a good faith omission and the requirements of paragraph (c)(3) and (4) of this section are met (including the completion of the qualified appraisal prior to the date specified in paragraph (c)(3)(iv)(B) of this section).

Sec. 1.170A-13(c)(4)(i), (ii)(I), (K), (L), (M), (iii), (iv)(E), (H), Income Tax Regs.

The IRS prescribed Form 8283 to be used as the appraisal summary within the meaning of section 1.170A-13(c)(4), Income Tax Regs.  See Costello v. Commissioner, T.C. Memo. 2015-87, at *15.  Petitioners included with their 2012 return Section B of Form 8283.  In their 2012 Section B, petitioners completed Part I, which is the listing of information on the "donated" property, (1) by checking the box next to the preprinted phrase "Other Real Estate"; (2) by describing the "donated property" as a single-family residence and its condition at the time of the "gift" as good; and (3) by representing (a) that the appraised fair market value of the "donated property" was $235,422, (b) that it was acquired in May 1992 by

[*85] purchase, and (c) that the donor's cost or adjusted basis was $104,500. Petitioners left blank Part II, the donor statement. Part III, the declaration of the appraiser, was also left blank. Part IV, the donee acknowledgement, was partially completed and contained the following information: (1) The "donated" property was received by the donee on April 30, 2012; (2) the donee did not intend to use that property for an "unrelated use"; and (3) the donee was PFM.[72] No authorized representative of PFM (or any other individual) signed and dated Part IV of petitioners' 2012 Section B.

Petitioners concede that Part III, the declaration of the appraiser, was left blank and that no authorized representative of PFM (or any other individual) signed and dated Part IV, the donee acknowledgement, of petitioners' 2012 Section B.[73] They argue that those "defects" in the completion of their 2012 Section B "should not disqualify Petitioners from receiving their charitable contribution deduction for the 2012 tax year" for petitioners' residence. That is because, according to petitioners, they "have substantially complied with all of the substantiation and documentation requirements of § 170 and met the substantive require-

---

[72]The address of PFM was also shown in Part IV of petitioners' 2012 Section B.

[73]Petitioners do not acknowledge that they left blank Part II, the donor statement.

**[\*86]** ments of § Treas. Reg. § 1.170A-13(c)(3)(ii) and are therefore entitled to the 2012 charitable contribution deduction."

In support of their argument that they substantially complied with all of the charitable contribution deduction substantiation requirements that apply to their claimed charitable contribution deduction of petitioners' residence, petitioners rely on Bond v. Commissioner, 100 T.C. 32 (1993). We find the facts in Bond to be materially distinguishable from the facts in the present case and petitioners' reliance on that case to be misplaced.

In Bond, the taxpayers had donated two airships to a charitable organization, obtained an appraisal of each of those airships by a qualified appraiser during the year in which they contributed them to that organization, and claimed a charitable contribution deduction for that taxable year for their donation. Id. at 41-42. The charitable contribution deduction substantiation requirements that were applicable for the year at issue in Bond provided that, where a qualified appraisal was required for a taxpayer's claimed charitable contribution, the taxpayer had to attach a fully completed appraisal summary to the return in which a deduction for the charitable donation is claimed. See sec. 1.170A-13(c)(2)(i)(B), Income Tax Regs. Although the taxpayers in Bond had obtained an appraisal of the airships, the only document reflecting that appraisal was Form 8283 (Form 8283 in ques-

[*87] tion), which they included with their return for the year in which they claimed the deduction in question. Bond v. Commissioner, 100 T.C. at 34. However, the taxpayers had included all of the information that was required to be included in both a qualified appraisal and in an appraisal summary in the Form 8283 in question except for the qualifications of the appraiser. The taxpayers promptly furnished those qualifications to respondent's revenue agent around the commencement of respondent's examination of the return in which they had claimed a charitable contribution deduction for the donation of the airships. See id. at 42.

Under the facts and circumstances presented in Bond, we held that the taxpayers had substantially complied with the charitable contribution deduction substantiation requirements relating to a qualified appraisal and an appraisal summary. See id. We stated: "[T]here is no question that a donation of the two airships was made during the taxable year, that the subject of the donation was appraised at the amount claimed by petitioners * * * by a qualified appraiser * * *. In fact, with the exception of the excellent qualifications of the appraiser all of these facts appeared on the Form 8283 attached to the return". Id. at 41-42. After restating these facts, we emphasized that "this is not a case where petitioners failed

[*88] to obtain a timely appraisal of the donated property and thereby failed to establish its value for claiming a contribution deduction on their return."[74] Id. at 42.

In contradistinction to the Bond case, in the present case not only did petitioners fail to have Mr. Scott complete Part III, the declaration of the appraiser, of their 2012 Section B of their 2012 Form 8283, but they also did not obtain and did not receive within the respective times prescribed by section 1.170A-13(c)(3)(i)(A) and (iv)(B), Income Tax Regs., a qualified appraisal.

On the record before us, we find that petitioners have failed to carry their burden of establishing that, as required by section 1.170A-13(c)(2)(i)(B), Income Tax Regs., they attached to their 2012 return a fully completed appraisal summary, as defined in section 1.170A-13(c)(4), Income Tax Regs. On that record, we find that petitioners have failed to carry their burden of establishing that they substantially complied with section 1.170A-13(c)(4), Income Tax Regs.

---

[74]We have held that taxpayers are not in substantial compliance with the charitable contribution deduction substantiation requirement relating to a qualified appraisal and an appraisal summary where they fail to obtain and receive timely qualified appraisals and fail to include appraisal summaries with their returns. See, e.g., Hewitt v. Commissioner, 109 T.C. 258, 264 (1997) ("We find nothing in Bond v. Commissioner, supra, which relieves petitioners of the requirement of obtaining a qualified appraisal."), aff'd, 166 F.3d 332 (4th Cir. 1998).

**[\*89]** On the record before us, we find that petitioners have failed to carry their burden of establishing that they have satisfied all of the charitable contribution deduction substantiation requirements that apply to the charitable contribution deduction that they claimed in their 2012 return for petitioners' residence.

We consider next petitioners' alternative argument under section 170(f)(11)(A)(ii)(II) that if we were to find that petitioners have failed to satisfy all of the charitable contribution deduction substantiation requirements that apply to the charitable contribution deduction that they claimed in their 2012 return for petitioners' residence, which we have, their failure to do so is due to reasonable cause. We discussed previously the meaning of the term "reasonable cause" in section 170(f)(11)(A)(ii)(II) and will not repeat that discussion here.

In support of their argument under section 170(f)(11)(A)(ii)(II), petitioners contend as follows:

> Petitioners argue that reasonable cause exists due to the fact that they relied upon their competent tax advisers (Kathy Burch, C.P.A. and David Dryer) with respect to the donation of the Residence to PFM. Both Ms. Burch and Mr. Dryer were competent and experienced tax advisers who were intimately familiar with Petitioners' financial affairs and PFM's operations. Both tax advisers testified that they were provided with copies of all documents pertaining to the donation of the Residence, were regularly advised of Petitioners' charitable contributions and advised Petitioners that the donation was proper for the 2012 tax year. Both advisers also testified that they read the appraisal and believed that it met the necessary requirements in order to take

**[*90]** the charitable contribution deduction.  Petitioners had no reason to doubt Ms. Burch's or Mr. Dryer's competence and believed that Ms. Burch had correctly reported the donation of the Residence on their 2012 tax return.  Plus, Ms. Burch failed to advise Petitioners that the Declaration of Appraiser and Donee Acknowledgement section of Form 8283 needed to be completed and signed prior to the filing of the 2012 tax return.  Accordingly, any failure to comply with the appraisal requirements should be excused on the grounds of reasonable cause.

We address first petitioners' claimed reliance on Mr. Dryer.  Mr. Dryer gave petitioners certain advice as to whether they are entitled for their taxable year 2012 to a charitable contribution deduction for petitioners' residence.  At times not disclosed by the record before petitioners filed their 2012 return, Mr. Dryer had done some research and had discussed with Mr. Presley (or his designee) on three different occasions whether he believed that petitioners should be entitled to a charitable contribution deduction with respect to their transferring to PFM legal title to petitioners' residence while continuing to live rent free in that residence.  Mr. Dryer's research included research as to whether PFM's allowing petitioners to continue to live in petitioners' residence as a parsonage after they deeded that residence to PFM would constitute a so-called return benefit to them (i.e., a benefit that petitioners received from PFM in return for their deeding petitioners' residence to PFM) that would result in their not being entitled to deduct the value of petitioners' residence as a charitable donation to PFM.  Mr. Dryer concluded on

[*91] the basis of his research that petitioners' continuing to live in petitioners' residence as a parsonage after they deeded it to PFM should not be considered a return benefit. That was because he believed that PFM's providing that parsonage benefit to petitioners should be viewed as compensation to which Mr. Presley would be entitled in return for conducting various activities and performing other services for or on behalf of PFM.

After completing his research and analysis, Mr. Dryer advised petitioners (or their designee) that, in his opinion, they should be entitled to a charitable contribution deduction with respect to their transferring to PFM legal title to petitioners' residence while continuing to live in that residence as a parsonage. Mr. Dryer further informed petitioners that his advice as to the deductibility of the value of petitioners' residence as a charitable contribution was conditioned on petitioners' compliance with the pertinent tax law and all the pertinent rules and regulations applicable to gifts to charity of substantial noncash contributions, including obtaining an appraisal of petitioners' residence because petitioners' residence had a value in excess of $5,000[75] and completing certain parts, and having completed by

[75]Mr. Dryer discussed the requirement that petitioners obtain an appraisal of petitioners' residence during the first discussion that he had with petitioners (or their designee) about their desire to donate that residence to PFM. At trial, petitioners' attorney asked Mr. Dryer: "Did the Presleys ever give you a copy of the

(continued...)

[*92] an appraiser and PFM (the donee charity) certain other respective parts, of

Section B of Form 8283. In formulating his advice with respect to whether peti-

tioners should be entitled to a charitable contribution deduction if they were to

donate petitioners' residence to PFM and continue to live in it, Mr. Dryer re-

viewed the version of Form 8283 that was in effect for taxable year 2012 and gave

petitioners some instructions about how to complete that form in order to comply

with the various rules and regulations applicable to substantial noncash charitable

contributions.

On the record before us, we find that petitioners did not rely on the advice

that Mr. Dryer gave them as to whether they are entitled for their taxable year

2012 to a charitable contribution deduction for petitioners' residence.[76]

---

[75](...continued)
appraisal that was done on the personal residence". Mr. Dryer responded: "I be-
lieve I looked at the appraisal a couple of times". The record does not establish
the appraisal to which petitioners' attorney and Mr. Dryer were referring. Nor
does the record establish when Mr. Dryer "looked at the appraisal a couple of
times". We have found that the appraisal with respect to petitioners' residence
that Mr. Scott prepared, namely, Mr. Scott's December 5, 2013 appraisal report,
was not made until December 5, 2013, the date on which he signed, and the date
of, that report. That date was after October 15, 2013, the date, including exten-
sions, for the filing of petitioners' 2012 return.

[76]On the record before us, we find that petitioners ignored Mr. Dryer's ad-
vice as to whether they are entitled for their taxable year 2012 to a charitable con-
tribution deduction for petitioners' residence. Petitioners disregarded Mr. Dryer's

(continued...)

[*93] We address now petitioners' claimed reliance on Ms. Burch. Even if we had found Ms. Burch's testimony to be credible in certain material respects, which we did not, we would find that petitioners did not rely in good faith on any advice that she gave them with respect to the charitable contribution deduction that they claimed in the 2012 return that she had prepared for them. As discussed previously petitioners disregarded Mr. Dryer's advice when they signed their 2012 return even though (1) they had not received Mr. Scott's December 5, 2013 appraisal report and (2) in Section B of Form 8283 that was included as part of that return they left blank Part II, the donor statement; Part III, the declaration of the appraiser, was also left blank; and no authorized representative of PFM (or any other individual) signed and dated Part IV, the donee acknowledgement. A review of the 2012 return that Ms. Burch had prepared for petitioners, in particular a review of Section B of Form 8283, would have caused a reasonable person, especially in the light of Mr. Dryer's advice, to ask Ms. Burch questions about those deficiencies in

---

[76](...continued)
advice when they signed their 2012 return even though (1) they had not received Mr. Scott's December 5, 2013 appraisal report and (2) in Section B of Form 8283 that was included as part of that return they left blank Part II, the donor statement; Part III, the declaration of the appraiser, was also left blank; and no authorized representative of PFM (or any other individual) signed and dated Part IV, the donee acknowledgement.

[*94] Section B of Form 8283. The record does not establish that petitioners made any such inquiry of Ms. Burch, presumably because they did not.

On the record before us, we find that petitioners have failed to carry their burden of establishing that they exercised ordinary business care and prudence or otherwise did what a reasonable person would do under the facts and circumstances. On that record, we find that petitioners have failed to carry their burden of establishing that they relied in good faith on Ms. Burch when she presented them for their review the 2012 return which she had prepared and in which there was a claimed charitable contribution deduction for petitioners' residence.

On the record before us, we find that petitioners have failed to carry their burden of establishing that their failure to satisfy all of the charitable contribution deduction substantiation requirements that apply to the charitable contribution deduction that they claimed in their 2012 return for petitioners' residence is due to reasonable cause and not to willful neglect within the meaning of section 170(f)(11)(A)(ii)(II).

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they are entitled for their taxable year 2012 to deduct under section 170(a) $235,422 for a claimed charitable contribution to PFM of petitioners' residence.

[*95] <u>Accuracy-Related Penalties</u>

Respondent determined in the notice that petitioners are liable for the accuracy-related penalty under section 6662(a) for each of their taxable years 2010 and 2012. Section 6662(a) imposes an accuracy-related penalty of 20 percent on an underpayment to which section 6662 applies. Section 6662 applies to the portion of any underpayment which is attributable to, inter alia, (1) negligence or disregard of rules or regulations, sec. 6662(b)(1), or (2) a substantial understatement of tax, sec. 6662(b)(2).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code. Sec. 6662(c). Negligence has also been defined as a failure to do what a reasonable person would do under the circumstances. See <u>Leuhsler v. Commissioner</u>, 963 F.2d 907, 910 (6th Cir. 1992), <u>aff'g</u> T.C. Memo. 1991-179; <u>Antonides v. Commissioner</u>, 91 T.C. 686, 699 (1988), <u>aff'd</u>, 893 F.2d 656 (4th Cir. 1990). The term "negligence" also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs. The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

For purposes of section 6662(b)(2) an understatement generally is equal to the excess of the amount of tax required to be shown in the tax return over the

[*96] amount of tax shown in the return.  Sec. 6662(d)(2)(A).  An understatement is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown in the tax return for that year or $5,000.  Sec. 6662(d)(1)(A).

The accuracy-related penalty does not apply to any portion of an under-payment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion.  Sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause and in good faith depends on all the pertinent facts and circumstances, including the taxpayer's efforts to assess the taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant.  Sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent bears the burden of production with respect to the accuracy-related penalty under section 6662(a) that respondent determined in the notice.  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  To satisfy respondent's burden of production under section 7491(c), respondent must produce evidence showing, inter alia, that respondent's representatives complied with section 6751(b)(1).  See Graev v. Commissioner, 149 T.C. ___ (Dec. 20, 2017), supplementing and overruling in part 147 T.C. 460 (2016).

**[*97]** To satisfy respondent's burden of production under section 7491(c), respondent must come forward with "sufficient evidence indicating that it is appropriate to impose" the penalty. See Higbee v. Commissioner, 116 T.C. at 446. Although respondent bears the burden of production with respect to the penalty under section 6662(a), respondent "need not introduce evidence regarding reasonable cause * * * or similar provisions. * * * the taxpayer bears the burden of proof with regard to those issues." Higbee v. Commissioner, 116 T.C. at 446.

We found the following facts that are relevant in determining whether respondent produced evidence showing, inter alia, that respondent's representatives complied with section 6751(b)(1). The revenue agent who examined petitioners' 2010 return and 2012 return, inter alia, proposed the initial determination that petitioners are liable for each of their taxable years 2010 and 2012 for the accuracy-related penalty under section 6662(a). After the revenue agent in question made that initial determination under section 6662(a), she gave her group manager, who was her immediate supervisor, a document titled "Civil Penalty Approval Form", which she had completed, as follows. The following statements appeared in a section of the penalty approval form titled "Reason(s) for Assertion of Penalty(s)": "The additional tax due for 2010 and 2012 is over $5,000 so the substantial understatement penalty does apply. TPs were negligent for not keeping proper docu-

[*98] mentation." The following pertinent portion of a preprinted statement appeared on the penalty approval form immediately below those just-quoted statements: "Group Manager Approval to Assess Penalties Identified Above". On July 16, 2014, the group manager signed and dated July 16, 2014, the penalty approval form as completed by the revenue agent.

Moreover, we have sustained respondent's determinations in the notice with respect to the charitable contribution deductions at issue that petitioners claimed in their 2010 return and 2012 return, respectively. On the record before us, we find that there is a substantial understatement of tax within the meaning of section 6662(d) for each of petitioners' taxable years 2010 and 2012.

On the record before us, we find that respondent has satisfied respondent's burden of production with respect to the accuracy-related penalty that respondent determined in the notice for each of petitioners' taxable years 2010 and 2012.

The only arguments that petitioners advance in support of their position that they are not liable for the accuracy-related penalty under section 6662(a) for each of their taxable years 2010 and 2012 is with respect to the charitable contribution deductions at issue.[77] According to petitioners, they acted with reasonable cause

---

[77]Petitioners concede all of the determinations in the notice except the three charitable contribution deductions at issue and the accuracy-related penalties. Pe-

(continued...)

[*99] and in good faith within the meaning of section 6664(c)(1) and section 1.6664-4(b)(1), Income Tax Regs., in claiming those deductions because they relied in good faith on the advice of Mr. Johnson when they claimed the two charitable contribution deductions at issue in their 2010 return and on Ms. Burch and Mr. Dryer when they claimed the charitable contribution deduction at issue in their 2012 return.

With respect to the charitable contribution deduction of $3,000 that petitioners claimed in their 2010 return, we found above that petitioners failed to carry their burden of establishing that they relied in good faith on Mr. Johnson when he presented them for their review the 2010 return that he had prepared and that included nowhere in their 2010 Form 8283 or in any other form, schedule, or attachment to that return any reference to or any information regarding a claimed charitable contribution deduction of $3,000 for a tractor/mower.

On the record before us, we find that petitioners have failed to carry their burden of establishing that there was reasonable cause for, and that they acted in good faith with respect to, the portion of the underpayment for their taxable year

---

[77](...continued)
titioners advance no arguments under sec. 6662(a) with respect to those other determinations that they concede and that result in an underpayment for each of petitioners' taxable years 2010 and 2012.

[*100] 2010 that is attributable to the charitable contribution deduction of $3,000 that they claimed in their 2010 return.

With respect to the charitable contribution deduction of $107,364 that they claimed in their 2010 return, as we discussed previously Mr. Presley testified that he informed Mr. Johnson and Mr. Dryer that in 2010 he donated to PFM his wholly owned limited liability company, PFM Farms. We find on the basis of that testimony that Mr. Presley did not provide accurate information to Mr. Johnson (or Mr. Dryer) on whose advice they contend they relied. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98-99.

Moreover, and as also discussed previously, although Mr. Johnson prepared petitioners' 2010 return, Mr. Dryer also gave advice to petitioners with respect to certain return reporting requirements that apply to the proposed donations to PFM described in the October 20, 2010 minutes of PFM's board (i.e., "the proposed donation [sic] of a tractor and land and soil preparation in order to develop ministry land"). He did so when he included the Form 8283 appraisal requirement language and the Form 8283 donor acknowledgement requirement language as part of the resolution set forth in those minutes. Mr. Dryer included that language because he wanted it to serve as an important reminder to obtain an appraisal of any substantial noncash property donated to PFM and to include a properly completed

**[*101]** and executed Form 8283 with petitioners' 2010 return with respect to the proposed donations of "a tractor and land and soil preparation". If, as Mr. Presley testified, he told Mr. Johnson that in 2010 he donated to PFM his wholly owned limited liability company, PFM Farms, Mr. Presley should have, as any reasonable person would have, asked Mr. Johnson after he reviewed the 2010 return that Mr. Johnson had prepared for petitioners, in particular after he reviewed petitioners' 2010 Form 8283, why Mr. Johnson did not include in that form any reference to or any information regarding the donation to PFM of PFM Farms. The record does not establish that Mr. Presley made any such inquiry of Mr. Johnson, presumably because he did not. We find on the basis of Mr. Presley's testimony that he informed Mr. Johnson (and Mr. Dryer) that in 2010 he donated PFM Farms to PFM that Mr. Presley did not rely in good faith on Mr. Johnson's preparation of the 2010 return as it related to the claimed charitable contribution deduction of $107,364. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98-99.

On the record before us, we find that petitioners have failed to carry their burden of establishing that there was reasonable cause for, and that they acted in good faith with respect to, the portion of the underpayment for their taxable year 2010 that is attributable to the charitable contribution deduction of $107,364 that they claimed in their 2010 return.

**[*102]** With respect to the charitable contribution deduction of $235,422 that petitioners claimed in their 2012 return, we found above that petitioners failed to carry their burden of establishing that they relied in good faith on Mr. Dryer or Ms. Burch when Ms. Burch presented them for their review the 2012 return that she had prepared and that included an incomplete Section B of Form 8283.

On the record before us, we find that petitioners have failed to carry their burden of establishing that there was reasonable cause for, and that they acted in good faith with respect to, the portion of the underpayment for their taxable year 2012 that is attributable to the charitable contribution deduction of $235,422 that they claimed in their 2012 return.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they are not liable for each of their taxable years 2010 and 2012 for the accuracy-related penalty under section 6662(a).

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

[*103] To reflect the foregoing and petitioners' concessions,

<u>Decision will be entered for</u>

<u>respondent</u>.